JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** 330 LANCASTER AVENUE, LLP.

**(b)** County of Residence of First Listed Plaintiff Montgomery County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
**FELDMAN SHEPHERD WOHLGELERNTERTANNER WEINSTOCK & DODIG, LLP**
**1845 Walnut St., 21st Floor**
**Philadelphia, PA 19103 215-567-8300**

**DEFENDANTS** BYRNES LEASE CO. LLC ,

Thornhill, Ontario, Canada
County of Residence of First Listed Defendant L3T 4A3
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❒ 1 U.S. Government Plaintiff
- ❒ 3 Federal Question *(U.S. Government Not a Party)*
- ❒ 2 U.S. Government Defendant
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | ❒ 1 | Incorporated *or* Principal Place of Business In This State | ❒ 4 | ❒ 4 |
| Citizen of Another State | ❒ 2 | ❒ 2 | Incorporated *and* Principal Place of Business In Another State | ❒ 5 | ❒ 5 |
| Citizen or Subject of a Foreign Country | ❒ 3 | [X] 3 | Foreign Nation | ❒ 6 | ❒ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ❒ 110 Insurance
- ❒ 120 Marine
- ❒ 130 Miller Act
- ❒ 140 Negotiable Instrument
- ❒ 150 Recovery of Overpayment & Enforcement of Judgment
- ❒ 151 Medicare Act
- ❒ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ❒ 153 Recovery of Overpayment of Veteran's Benefits
- ❒ 160 Stockholders' Suits
- [X] 190 Other Contract
- ❒ 195 Contract Product Liability
- ❒ 196 Franchise

**REAL PROPERTY**
- ❒ 210 Land Condemnation
- ❒ 220 Foreclosure
- ❒ 230 Rent Lease & Ejectment
- ❒ 240 Torts to Land
- ❒ 245 Tort Product Liability
- ❒ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ❒ 310 Airplane
- ❒ 315 Airplane Product Liability
- ❒ 320 Assault, Libel & Slander
- ❒ 330 Federal Employers' Liability
- ❒ 340 Marine
- ❒ 345 Marine Product Liability
- ❒ 350 Motor Vehicle
- ❒ 355 Motor Vehicle Product Liability
- ❒ 360 Other Personal Injury
- ❒ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ❒ 365 Personal Injury - Product Liability
- ❒ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ❒ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ❒ 370 Other Fraud
- ❒ 371 Truth in Lending
- ❒ 380 Other Personal Property Damage
- ❒ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ❒ 440 Other Civil Rights
- ❒ 441 Voting
- ❒ 442 Employment
- ❒ 443 Housing/ Accommodations
- ❒ 445 Amer. w/Disabilities - Employment
- ❒ 446 Amer. w/Disabilities - Other
- ❒ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ❒ 463 Alien Detainee
- ❒ 510 Motions to Vacate Sentence
- ❒ 530 General
- ❒ 535 Death Penalty

**Other:**
- ❒ 540 Mandamus & Other
- ❒ 550 Civil Rights
- ❒ 555 Prison Condition
- ❒ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ❒ 625 Drug Related Seizure of Property 21 USC 881
- ❒ 690 Other

**LABOR**
- ❒ 710 Fair Labor Standards Act
- ❒ 720 Labor/Management Relations
- ❒ 740 Railway Labor Act
- ❒ 751 Family and Medical Leave Act
- ❒ 790 Other Labor Litigation
- ❒ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ❒ 462 Naturalization Application
- ❒ 465 Other Immigration Actions

**BANKRUPTCY**
- ❒ 422 Appeal 28 USC 158
- ❒ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ❒ 820 Copyrights
- ❒ 830 Patent
- ❒ 835 Patent - Abbreviated New Drug Application
- ❒ 840 Trademark

**SOCIAL SECURITY**
- ❒ 861 HIA (1395ff)
- ❒ 862 Black Lung (923)
- ❒ 863 DIWC/DIWW (405(g))
- ❒ 864 SSID Title XVI
- ❒ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ❒ 870 Taxes (U.S. Plaintiff or Defendant)
- ❒ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ❒ 375 False Claims Act
- ❒ 376 Qui Tam (31 USC 3729(a))
- ❒ 400 State Reapportionment
- ❒ 410 Antitrust
- ❒ 430 Banks and Banking
- ❒ 450 Commerce
- ❒ 460 Deportation
- ❒ 470 Racketeer Influenced and Corrupt Organizations
- ❒ 480 Consumer Credit
- ❒ 485 Telephone Consumer Protection Act
- ❒ 490 Cable/Sat TV
- ❒ 850 Securities/Commodities/ Exchange
- ❒ 890 Other Statutory Actions
- ❒ 891 Agricultural Acts
- ❒ 893 Environmental Matters
- ❒ 895 Freedom of Information Act
- ❒ 896 Arbitration
- ❒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ❒ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding ❒ 2 Removed from State Court ❒ 3 Remanded from Appellate Court ❒ 4 Reinstated or Reopened ❒ 5 Transferred from Another District *(specify)* ❒ 6 Multidistrict Litigation - Transfer ❒ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: 28 U.S.C. § 1332

Brief description of cause: BREACH OF CONTRACT

## VII. REQUESTED IN COMPLAINT:

❒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** IN EXCESS OF $75000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes ❒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE 10/05/2026 SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 281 Montgomery Avenue, Bala Cynwyd, Pennsylvania 19004

Address of Defendant: 7750 Bayview Avenue, Thornhill, Ontario, Canada L3T 4A3

Place of Accident, Incident or Transaction: 330 Lancaster Avenue, Malvern, Chester County, Pennsylvania

***RELATED CASE, IF ANY:***

Case Number: ______________ Judge: ______________ Date Terminated: ______________

Civil cases are deemed related when ***Yes*** is answered to any of the following questions:

| | | Yes | No |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | ☐ | ☒ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | ☐ | ☒ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | ☐ | ☒ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | ☐ | ☒ |

I certify that, to my knowledge, the within case ☐ **is** / ☒ **is not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: October 5, 2026 — Mark W. Tanner, Esquire — 58738
*Attorney-at-Law / Pro Se Plaintiff* — *Attorney I.D. # (if applicable)*

**CIVIL: (Place a √ in one category only)**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases *(Please specify):* ______________

***B. Diversity Jurisdiction Cases:***

- ☒ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* ______________
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases *(Please specify):* ______________

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Mark W. Tanner, Esquire, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: October 5, 2026 — [signature] — 58738
*Attorney-at-Law / Pro Se Plaintiff* — *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

# CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| 330 LANCASTER AVENUE, LLP. | : | CIVIL ACTION |
| v. | : | |
| BYRNES LEASE CO. LLC , ET AL. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. **(X)**

| 10/05/2026 | MARK W. TANNER | PLAINTIFF |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-567-8300 | 215-567-8333 | mtanner@feldmanshepherd.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a) The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b) In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c) The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d) Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e) Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 330 LANCASTER AVENUE, LLP.<br>281 Montgomery Avenue<br>Bala Cynwyd, Pennsylvania 19004<br>Plaintiff, | CIVIL ACTION:<br><br>DOCKET NO. |
| v. | **JURY TRIAL DEMANDED** |
| BYRNES LEASE CO. LLC ,<br>7750 Bayview Avenue<br>Thornhill, Ontario, Canada L3T 4A3<br>and<br>EBS HOLDINGS LIMITED<br>61 St. Clair Ave W Unite 1908<br>Toronto, Ontario, Canada M4V 1K6<br>Defendants. | |

# COMPLAINT

Plaintiff 330 Lancaster Avenue, LLP, by and through its undersigned counsel, files this Complaint against Defendants Byrnes Lease Co. LLC and EBS Holdings Limited, and in support thereof states as follows:

## I. PARTIES

1. Plaintiff 330 Lancaster Avenue, LLP ("Landlord") is a Pennsylvania limited liability partnership with its principal place of business located at 281 Montgomery Avenue, Bala Cynwyd, Pennsylvania 19004.

2. The partners of Plaintiff are citizens of Pennsylvania, and none of Plaintiff's partners is a citizen of Delaware, Canada, or any other state or foreign jurisdiction of which any Defendant is a citizen.

3. Defendant Byrnes Lease Co. LLC ("Tenant") is a Delaware limited liability company authorized to do business in the Commonwealth of Pennsylvania, with its principal place of business located at 7750 Bayview Avenue, Thornhill, Ontario, Canada L3T 4A3.

4. Upon information and belief, Tenant's members are not citizens of Pennsylvania, and no member of Tenant is a citizen of the same state or foreign jurisdiction as any partner of Plaintiff.

5. Defendant EBS Holdings Limited ("Surety") is a corporation existing and governed by the laws of the Province of Ontario, Canada, with its principal place of business located at 61 St. Clair Ave W Unite 1908, Toronto, Ontario, Canada M4V 1K6.

6. Upon information and belief, Surety's members are not citizens of Pennsylvania, and no member of Surety is a citizen of the same state or foreign jurisdiction as any partner of Plaintiff.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action based upon complete diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff is diverse from Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. The amount in controversy exceeds $75,000.00 because Plaintiff seeks, among other damages, lost rent, out-of-pocket expenditures, broker commissions, professional fees, attorneys' fees, costs, interest, and other damages arising from Defendants' breaches of the Lease, Lease Amendment, and Surety Agreement.

9. This Court has personal jurisdiction over Defendants because Defendants transacted business in Pennsylvania, entered into agreements concerning real property located in Chester County, Pennsylvania, consented to personal jurisdiction in Pennsylvania through the Lease Agreement and Surety Agreement, and the claims asserted herein arise from those Pennsylvania-related agreements and obligations.

10. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, the real property that is the subject of the Lease is located in this District, and Defendants consented to venue in Pennsylvania through the Lease Agreement and Surety Agreement.

11. Venue is also proper because the Surety Agreement supplied by Defendants and incorporated into the Lease Agreement provides that disputes involving the application or enforcement of the Surety Agreement shall be litigated in the state or federal courts of Chester County, Pennsylvania, at Plaintiff/Lessor's option.

## III. FACTUAL BACKGROUND

### A. The Lease Agreement and Amendment

12. On or about May 21, 2020, Landlord and Tenant entered into a written Lease Agreement ("Lease") for the premises located at 330 Lancaster Avenue, Malvern, Chester County, Pennsylvania ("Premises"), consisting of approximately 24,000 rentable square feet. A true and correct copy of the Lease Agreement is attached hereto as Exhibit "A."

13. The Lease provided for a Primary Term of 122 months with two five-year renewal options, with annual base rent beginning at $840,000.00, or $70,000.00 per month, increasing annually by 1.75%.

14. The Premises were to be used as a specialty hospital, including care suites associated with an overnight recovery facility for stays of up to five days, patient amenity space, related treatment services, and associated medical office and administrative space.

15. To accommodate Tenant's requirements under the Lease, the Lease required Landlord to perform substantial work to the Premises ("Landlord's Work"), which work is detailed in Exhibit B to the Lease. The Landlord's Work included, but was not limited to, bringing the

building into compliance with the Americans with Disabilities Act and applicable governmental regulations as of the Commencement Date, making the Premises water-tight for use as a hospital, replacing and/or repairing sidewalks, and repaving the parking lot.

16. Tenant also required highly specialized equipment and modifications to the space, referred to as the "Tenant Work," which initially were estimated to cost $4,000,000.00. Landlord was to pay $3,000,000.00 of the estimated $4,000,000.00 cost.

17. Under the Lease, the Commencement Date was tied to substantial completion of the Tenant's Improvements and written confirmation by Tenant that contingencies for obtaining certain approvals had been satisfied. See Article 1(A) of the Lease. The Rent Commencement Date was to be 60 days after the Commencement Date. See Article 2(A) of the Lease.

18. On or about April 1, 2022, the parties entered into a Lease Amendment Agreement ("Amendment"), pursuant to which Tenant requested that Landlord expand the Premises by constructing a 3,300 square foot addition, increasing the building to approximately 27,300 square feet. A true and correct copy of the Amendment is attached hereto as Exhibit "C."

19. The Amendment increased the estimated cost of Tenant's Work from $4,000,000.00 to $6,000,000.00 and increased Landlord's Initial Contribution for the Tenant's Improvements from 75%, or $3,000,000.00, to 83.33%, or $5,000,000.00, of the total costs. The Amendment also revised Article 1(A) to replace the reference to "Tenant's Improvements" with "Tenant's Work."

20. The Amendment extended the deadline for Tenant to obtain all required Approvals to December 31, 2022.

**B. Tenant's Contractual Obligations Regarding Approvals**

21. Article 1(D) of the Lease expressly made the Lease contingent upon Tenant and/or its Affiliate receiving unappealed and unappealable approval of three categories of approvals: (1) Township zoning and land-use approvals from East Whiteland Township ("Township Approvals"); (2) building permit applications to permit construction of Landlord's Work and Tenant's Work by the East Whiteland Township codes enforcement officer, and approval of the Construction Documents from the state health department and other governmental authorities having jurisdiction over hospital licensing and operations ("Construction Approvals"); and (3) Operating Licenses from all local, state, and federal licensing authorities ("Operating Licenses"). Collectively, the Township Approvals, Construction Approvals, and Operating Licenses are referred to as the "Approvals."

22. Article 1(D) of the Lease required, inter alia, that "Tenant or its Affiliate shall apply for and diligently pursue in good faith all such Approvals."

23. Article 1(D) provided that Landlord would assist Tenant in obtaining such Approvals "at no material expense to Landlord."

24. If, after diligently applying for and pursuing such Approvals in good faith, Tenant was unable to obtain the Approvals by December 31, 2022, either Tenant or Landlord could terminate the Lease by written notice to the other.

25. Article 5(A)(ii) of the Lease required Tenant "to procure, or cause its Affiliate intending to operate its business at the Demised Premises to procure, all licenses and permits necessary or desirable therefor at Tenant's or its Affiliate's sole expense."

**C. Landlord's Substantial Performance and Expenditures**

26. In reliance upon the Lease and Tenant's contractual obligations, and at Tenant's specific request, Landlord expended considerable sums performing Landlord's Work.

27. Landlord also terminated existing tenant leases for the entire Premises, as the entire building needed to be renovated and made suitable for Tenant's intended use as a specialty hospital.

28. Landlord made substantial expenditures on renovations and improvements to make the Premises suitable for Tenant's intended use, and for other expenses triggered by the Lease obligations, totaling not less than $962,618.28.

29. Landlord's payments for work at the Premises pursuant to Landlord's lease obligations included, but were not limited to, the following:

a. R-E Builders Inc.: $550,000.00;

b. Architectural Concepts, PC: $76,556.50;

c. Commonwealth Engineers, Inc.: $37,401.05;

d. Chestnut Technical Services: $28,600.00;

e. Lundy Beldecos & Milby: $21,570.50;

f. Array Architects: $5,500.00;

g. East Whiteland Township: $2,012.50; and

h. Chester County Planning Commission: $688.00.

30. Some of the renovations and improvements that Landlord performed were Tenant's responsibility under the Lease, but Tenant requested that Landlord pay for those expenses as part of Tenant's improvement allowance.

31. The broker commission agreements between Landlord and both Colliers International and Jackson Cross Partners provided that commissions would be "paid by Owner to Broker fifty percent (50%) upon the later of (i) the execution of the lease agreement or (ii) the

satisfaction of all Tenant contingencies and fifty percent (50%) upon occupancy of the Premises by Tenant and Owner's receipt of the first month's rent."

32. Landlord paid the full first installment of broker commissions totaling $240,289.73 on June 12, 2020, consisting of $160,193.15 to Colliers International and $80,096.58 to Horizon Services & Management Co., LLC, successor to the original broker.

**D. Tenant's Breach: Failure to Diligently Pursue Approvals in Good Faith**

33. Tenant failed to diligently pursue in good faith all required Approvals and failed to take all required actions mandated by Article 1(D) of the Lease.

34. While Landlord was involved at the local level to assist in obtaining licenses and approvals for Landlord's Work, Tenant was solely responsible for pursuing the Construction Approvals for Tenant's Work and the Operating Licenses.

35. Upon information and belief, Tenant deliberately delayed and stalled in pursuing the Operating Licenses as the December 31, 2022 deadline approached, with the intention of creating grounds to terminate the Lease, attempting to renegotiate more favorable terms, and/or withdrawing from the Lease due to changed circumstances that did not provide a contractual basis for termination.

**E. The Pennsylvania Department of Health Approval**

36. The Pennsylvania Department of Health issued an approval letter dated November 28, 2022, approving the construction plans for the Shouldice Hernia Hospital project. A true and correct copy of the letter is attached hereto as Exhibit "D."

37. The approval letter stated: "Plans for the subject project have been approved. This is a Type II (111) fully sprinklered building construction as per NFPA 220 and shall comply with

the NFPA 101, 'Life Safety Code,' 2012 Edition, including Chapter 2 and all Hospital Licensure Regulations as adopted by the Pennsylvania Department of Health."

38. The November 28, 2022 approval demonstrated that the Pennsylvania Department of Health had completed its review and approved the Construction Documents, providing a clear path forward for obtaining Operating Licenses.

39. Upon information and belief, Tenant was aware of this approval, or the imminent approval, when it terminated the Lease on January 13, 2023.

**F. Tenant's Wrongful Termination**

40. On January 13, 2023, Tenant sent Landlord a Notice of Termination of Lease Agreement, purporting to terminate the Lease pursuant to Article 1(D). A true and correct copy of the Notice is attached hereto as Exhibit "E."

41. In the termination notice, Tenant represented that "despite our diligent and good faith pursuit of all Approvals, we were unsuccessful in obtaining the Operating Licenses by December 31, 2022, and it must be clear to us both that obtaining an Operating License is many months away."

42. This Notice was the first time Tenant had ever raised or identified any difficulties or delays in obtaining the necessary approvals or permits with Landlord. Until that point, Tenant's representations were that the matter was progressing appropriately.

43. Tenant's representation that it had engaged in "diligent and good faith pursuit of all Approvals" was false.

44. Tenant's representation that obtaining an Operating License was "many months away" was false or made without reasonable investigation, given that the Pennsylvania Department

of Health had approved the construction plans on November 28, 2022, just weeks before Tenant's termination.

45. Upon information and belief, the Operating License approvals were in fact received within weeks after the termination letter was sent or, if not actually received, could have been received by Tenant if Tenant had used good-faith efforts to obtain them.

46. In the termination notice, Tenant stated: "Given the extensive time and effort of the parties to date to obtain the Approvals and prepare the Demised Premises for use and occupancy, we remain open to discussing potential terms for a new lease as a possible future path to allow both parties to recognize a return on their respective investments to date."

47. After sending the termination notice, Tenant attempted to negotiate new terms for the Lease with more favorable conditions for Tenant, which Landlord declined.

48. Upon information and belief, Tenant's purported termination was pretextual and motivated by factors unrelated to any alleged difficulty obtaining Approvals. Rather, this decision was motivated in part by the death of the founder of Shouldice Hospital and the heirs' lack of interest in pursuing the project.

49. Tenant's termination was improper because Tenant failed to satisfy its prerequisite obligations to diligently pursue the Approvals in good faith.

**G. Landlord's Detrimental Reliance**

50. Throughout the period from May 21, 2020 through January 13, 2023, Landlord had no notice or indication from Tenant of any intent to terminate the Lease, nor any notice that there were unexpected delays or difficulties in the permit and approval process.

51. Tenant failed to communicate with Landlord regarding any difficulties or delays in obtaining the Construction Approvals or Operating Licenses.

52. Landlord continued to expend substantial sums on the Premises in reliance upon Tenant's representations that it was diligently pursuing all Approvals in good faith and would complete the transaction.

53. The Lease Amendment executed on April 1, 2022 further evidenced the parties' mutual commitment to the transaction, with Landlord agreeing to construct a 3,300 square foot addition and increase its financial contribution to $5,000,000.00.

54. As late as November 2022, construction and design work was ongoing, with architectural invoices dated October 4, 2022 and October 25, 2022.

55. Landlord was blindsided by Tenant's termination notice on January 13, 2023, having received no prior warning or indication that Tenant was considering termination.

56. At all times relevant and material hereto, Landlord fulfilled all of Landlord's obligations under the Lease, and at no time did Tenant ever advise Landlord of any failure on the part of Landlord to fulfill such obligations.

57. Following Tenant's termination notice, Landlord provided Tenant with a detailed written Notice of default and breach, pursuant to the terms of the Lease and provided Tenant with an opportunity to cure.

58. Tenant did not respond to Landlord's Notice of default and breach, and Tenant took no steps to cure the default and/or breach of the lease agreement.

**H. Surety's Liability**

59. Contemporaneously with the Lease, Surety executed a Surety Agreement whereby Surety became surety to Landlord for the full, faithful, and prompt performance by Tenant of all terms, covenants, agreements, and conditions to be fulfilled and performed by Tenant under the Lease. A true and correct copy of the Surety Agreement is attached hereto as Exhibit "B."

60. The Surety Agreement provides that Surety is liable for "all costs, expenses and damages (including reasonable attorneys and costs) which Lessor, or Lessor's successors or assigns may suffer or incur by reason of the occurrence of any Event of Default by Lessee under the Lease."

61. The Surety Agreement further provides that no termination of the Lease shall deprive Lessor of any remedies or actions against Surety "for sums due at the time, or which, under the terms of the said Lease Agreement and of this Surety Agreement, would in the future become due as if there had been no termination."

62. The Surety Agreement limits Surety's liability to $3,000,000.00 until the end of the third Lease Year, increased by the amount of any past due rent and the Leasing Commission Payoff Amount.

63. Surety has refused to reimburse Landlord for any of its out-of-pocket expenses or other damages arising from Tenant's breaches of the Lease.

## COUNT I

## BREACH OF CONTRACT

## Plaintiff v. Tenant

64. Landlord incorporates by reference paragraphs 1 through 59 as if fully set forth herein.

65. The Lease and Amendment constitute valid and enforceable contracts between Landlord and Tenant, supported by adequate consideration.

66. Under Pennsylvania law, every contract contains an implied covenant of good faith and fair dealing, which requires that parties refrain from acting in a manner that would deprive the other party of the benefits of the contract.

67. Tenant's obligation under Article 1(D) to "apply for and diligently pursue in good faith all such Approvals" expressly incorporated a good-faith standard into the Lease.

68. Tenant violated the covenant of good faith and fair dealing by deliberately failing to diligently pursue the Operating Licenses and Construction Approvals and by concealing from Landlord its true intention not to obtain the Operating Licenses and Construction Approvals.

69. Tenant breached the Lease by failing to make efforts, and in fact stopping efforts in the summer and fall of 2022, to diligently pursue in good faith all required Approvals by December 31, 2022, in violation of Article 1(D), as amended.

70. Tenant breached the Lease by failing to procure all licenses and permits necessary for its use at its sole expense by December 31, 2022, in violation of Article 1(D), as amended, Article 5(A)(ii), and Article 5(A)(v).

71. Tenant's termination of the Lease on January 13, 2023 was a breach of the Lease because Tenant could have satisfied its prerequisite obligations if it had pursued the Approvals in good faith.

72. Tenant's conduct in terminating the Lease while simultaneously proposing to "discuss potential terms for a new lease" demonstrates Tenant's improper motive to escape its contractual obligations and renegotiate more favorable terms.

73. Tenant breached the Lease by failing to pay the first installment of rent on the Rent Commencement Date, which should have been March 1, 2023.

74. Tenant violated the covenant of good faith and fair dealing by concealing its lack of diligent pursuit while Landlord continued to invest substantial sums in the Premises.

75. Tenant violated the covenant of good faith and fair dealing by deliberately stalling the permit approval process as the December 31, 2022 deadline approached in order to manufacture grounds for termination.

76. Tenant violated the covenant of good faith and fair dealing by purporting to terminate the Lease based on alleged inability to obtain Approvals when, in fact, the Pennsylvania Department of Health had approved the construction plans on November 28, 2022, and Operating Licenses were obtainable within weeks.

77. Tenant violated the covenant of good faith and fair dealing by terminating the Lease for the ulterior motive of attempting to renegotiate more favorable lease terms, as evidenced by Tenant's statement in the termination notice expressing openness to "discussing potential terms for a new lease."

78. Landlord substantially performed all of its obligations under the Lease and Amendment, including making substantial expenditures on tenant improvements and assisting Tenant with local approvals.

79. Tenant's conduct deprived Landlord of the benefits of its bargain under the Lease, including a long-term commercial lease with substantial rental income and the ability to recover its significant capital investments through rent payments over the Primary Term.

80. As a direct and proximate result of Tenant's breaches, Landlord has suffered substantial damages, including but not limited to lost rent, out-of-pocket expenditures of not less than $962,618.28 on tenant improvements, broker commissions, professional fees, lost rents, and other costs incurred in reliance upon the Lease.

81. Pursuant to Article 22 of the Lease, Landlord is entitled to recover its reasonable attorneys' fees and costs incurred in prosecuting this action.

WHEREFORE, Plaintiff 330 Lancaster Avenue, LLP demands judgment in its favor and against Defendant Byrnes Lease Co. LLC in an amount to be determined at trial, but in excess of $75,000.00, together with interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT II

## PROMISSORY ESTOPPEL

## Plaintiff v. Tenant

82. Landlord incorporates by reference paragraphs 1 through 77 as if fully set forth herein.

83. Through the Lease and Amendment, and through its ongoing conduct during the period from May 21, 2020 through January 13, 2023, Tenant made clear and unambiguous promises to Landlord, including but not limited to:

a. That Tenant would apply for and diligently pursue in good faith all required Approvals and advise Plaintiff of any difficulties in doing so;

b. That Tenant would perform its obligations under the Lease in good faith; and

c. That Tenant would proceed with the transaction and occupy the Premises upon obtaining the required Approvals.

84. Tenant knew or should have known that Landlord would rely upon these promises in making substantial expenditures on the Premises.

85. Tenant deliberately failed to provide material information to Landlord regarding the permit and approval process, which Tenant was obligated to provide and which Tenant knew or should have known would cause Landlord to refrain from additional expenditures if it appeared

that the contingency under the Lease was in danger of not being satisfied. In essence, Tenant also made a misrepresentation by omission.

86. Landlord reasonably and justifiably relied upon Tenant's promises by:

a. Expending not less than $962,618.28 on renovations, improvements, professional fees, and broker commissions;

b. Terminating existing tenant leases for the entire Premises;

c. Continuing to fund tenant improvements and professional services through late 2022;

d. Entering into the April 1, 2022 Amendment expanding the Premises and increasing Landlord's financial obligations; and

e. Foregoing other potential tenants and uses for the Premises.

87. Tenant failed to provide Landlord with any notice of any intent to terminate the Lease prior to sending the termination notice on January 13, 2023.

88. Tenant failed to report any inability to obtain the necessary permits and licenses prior to sending the termination notice on January 13, 2023.

89. Had Tenant complied with its obligations under Article 1(D) in good faith, Landlord would have learned of any difficulties in obtaining Construction Approvals and could have ceased making further expenditures or taken other protective measures.

90. Tenant's silence regarding both its lack of diligent pursuit of the Approvals and its consideration of termination induced Landlord to continue making substantial expenditures in the reasonable belief that the transaction would proceed.

91. Landlord's reliance was foreseeable to Tenant, as the Lease expressly contemplated that Landlord would make substantial expenditures, estimated at $5,000,000.00 under the Amendment, for tenant improvements.

92. Landlord substantially changed its position to its detriment in reliance upon Tenant's promises.

93. Enforcement of Tenant's promises is necessary to avoid injustice, as Landlord has expended considerable sums in reasonable reliance upon Tenant's contractual obligations and representations, and Tenant has refused to compensate Landlord for these expenditures.

94. As a direct and proximate result of Tenant's conduct, Landlord has suffered substantial damages as set forth throughout this Complaint.

WHEREFORE, Plaintiff 330 Lancaster Avenue, LLP demands judgment in its favor and against Defendant Byrnes Lease Co. LLC in an amount to be determined at trial, but in excess of $75,000.00, together with interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT III

## BREACH OF SURETY AGREEMENT

## Plaintiff v. Surety

95. Landlord incorporates by reference paragraphs 1 through 90 as if fully set forth herein.

96. The Surety Agreement is a valid and enforceable contract between Landlord and Surety. The Surety Agreement was also incorporated into, and made an exhibit to, the Lease Agreement between Landlord and Tenant.

97. Pursuant to the Surety Agreement, Surety became surety for "the full, faithful and prompt performance by Lessee of all the terms, covenants, agreements and conditions to be fulfilled and performed by Lessee under and pursuant to the aforesaid Lease Agreement, and for the full, faithful and prompt payment of all sums of money (in US Dollars) which, by virtue of said Lease Agreement, shall at any time or times become due and owing by Lessee including, without limitation thereto, all monies specifically reserved as rent thereunder and all costs, expenses and damages (including reasonable attorneys and costs) which Lessor, or Lessor's successors or assigns may suffer or incur by reason of the occurrence of any Event of Default by Lessee under the Lease."

98. Tenant's breaches of the Lease as alleged herein constitute Events of Default under the Lease and trigger Surety's obligations under the Surety Agreement.

99. The Surety Agreement specifically provides that "No termination of the said Lease Agreement or the taking or recovery of the premises, which in either case does not effect a release of Lessee's obligations under the Lease Agreement, shall deprive Lessor of any of its remedies or actions against the undersigned for sums due at the time, or which, under the terms of the said Lease Agreement and of this Surety Agreement, would in the future become due as if there had been no termination."

100. Surety has failed and refused to perform its obligations under the Surety Agreement despite Landlord's demands.

101. As a direct and proximate result of Surety's breach, Landlord has suffered substantial damages as set forth throughout this Complaint.

102. Pursuant to the Surety Agreement, Landlord is entitled to recover its reasonable attorneys' fees and costs in enforcing the Surety Agreement.

WHEREFORE, Plaintiff 330 Lancaster Avenue, LLP demands judgment in its favor and against Defendant EBS Holdings Limited in an amount to be determined at trial, subject to the limitations set forth in the Surety Agreement, but in excess of $75,000.00, together with interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

Respectfully submitted,
FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP

**/s/ MARK W. TANNER, ESQUIRE**

MARK W. TANNER, ESQUIRE
Attorney for Plaintiff

THE GRANGER FIRM

**/s/ BLAIR H. GRANGER, ESQUIRE**

BLAIR H. GRANGER, ESQUIRE
Attorney for Plaintiff

Date: October 5, 2026

# EXHIBIT "A"

# LEASE AGREEMENT

THIS LEASE (this "Lease") is made and entered into this 21 day of May, 2020, between 330 LANCASTER AVENUE, LLP, a Pennsylvania limited liability partnership (hereinafter called "Landlord"), and BYRNES LEASE CO. LLC, a Delaware limited liability company (hereinafter called "Tenant").

## WITNESSETH:

Landlord, for and in consideration of the covenants and agreements hereinafter set forth to be kept and performed by both parties, does hereby demise and lease to Tenant (for the term hereinafter stipulated) all that certain land (the "Land") (including all parking areas) and the improvements thereon situate (consisting of a building ("Building") containing approximately 24,000 rentable square feet) located at 330 Lancaster Avenue Malvern Pennsylvania as more particularly described in Exhibit A attached hereto (the Land and Building are hereafter referred to as the "Demised Premises").

The parties agree that Tenant shall be deemed to occupy a one hundred percent (100%) of the Demised Premises for all allocations and purposes arising pursuant to this Lease.

Landlord hereby leases the Demised Premises to Tenant and hereby grants to Tenant its guests, invitees and licensees the use of all easements, rights and privileges appurtenant thereto.

## ARTICLE 1
## TERM, USE AND EARLY TERMINATION

A. Subject to the provisions of Article 6 E, the Primary Term (herein so called) of this Lease shall begin upon the substantial completion of Tenant's Improvements (hereafter defined) and written confirmation by Tenant that the contingencies described in clause D. below have been satisfied ("Commencement Date") and shall expire on the last day of the month within which the one hundred and twenty-second (122nd) month following the Commencement Date occurs ("Primary Term"). The Primary Term and any Renewal Terms (hereinafter defined) are sometimes collectively referred to herein as the "Term". The Demised Premises and Tenant's Work shall be deemed substantially completed upon Tenant's receipt of a certificate of occupancy from East Whiteland Township. For the avoidance of doubt, substantial completion shall not include the installation of Tenant's technology, furniture, fixtures and equipment. The parties hereto shall enter into a lease supplement establishing the Primary Term and the Rent Commencement Date.

B. Provided that no Event of Default (hereinafter defined) has occurred and is continuing beyond the applicable cure period, Tenant shall have the option to renew this Lease for two (2) successive periods of five (5) years each (each such period, a "Renewal Term" and,

collectively, the "Renewal Terms"). Each Renewal Term will be on the same terms and conditions as provided herein except that the Base Rent (as hereinafter defined) shall be as set forth in Article 2.E. Notice of the exercise of such options shall be given by Tenant to Landlord in writing not later the later of (1) nine (9) months prior to expiration of the Primary Term or (2) thirty (30) days following the issuance of written notice from Landlord to Tenant that the Primary Term, or Initial Term, as applicable will expire on the date set forth in the notice unless Tenant's option to renew is exercised, which notice shall be issued not sooner than sixty (60) days prior the scheduled expiration date of the Primary Term or Renewal Term, as applicable. Time is of the essence.

C. The Demised Premises may be used and occupied by Tenant, its Affiliate (and their respective successors and assigns) for any lawful use ("Permitted Use"), including without limitation a specialty hospital, including care suites associated with an overnight recovery facility for stays of up to 5 days, patient amenity space, related treatment services and associated medical office and administrative space. ("Primary Intended Use"). Notwithstanding the aforesaid, the Permitted Use must always be in accordance with all statutes and regulations of governmental authorities with jurisdiction over the Permitted Use, and any licenses issued or required in reference to the Permitted Use or the Demised Premises. Notwithstanding the foregoing, the Demised Premises shall at no time be operated as a pet hospital.

D. This Lease is expressly contingent upon Tenant and/or its Affiliate receiving unappealed and unappealable approval, subject to such conditions as are acceptable to Tenant, of (1) Tenant's Primary Intended Use from East Whiteland Township under the zoning and land use ordinances and regulations of East Whiteland Township ("Township Approvals"), (2) building permit applications to permit construction of Landlord's Work and Tenant's Work by the East Whiteland Township codes enforcement officer, and of the Construction Documents by the state health department and any other governmental authority having jurisdiction over the licensing and operations of hospitals at the Demised Premises ("Construction Approvals") and (3) Tenant's application to all local, state and federal licensing authorities for license(s) to operate the Primary Permitted Use (the "Operating Licenses"). The Township Approvals, Construction Approvals and Operating Licenses are collectively called the "Approvals". Tenant or its Affiliate shall apply for and diligently pursue in good faith all such Approvals. Landlord will assist Tenant, in obtaining such Approvals at no material expense to Landlord. In the event Tenant is unable to obtain the Approvals within 365 days following the date hereof, either Tenant or Landlord may terminate this Lease by written notice to the other. Tenant shall provide to Landlord periodic progress reports with respect to its efforts to achieve the Approvals.

E. Notwithstanding any provisions contained in this Lease to the contrary, Tenant shall have two (2) options to terminate the Lease, the first option at the end of the third (3rd) Lease year of the Primary Term and the second option at the end of the fifth (5th) Lease Year of the Primary Term, upon satisfaction of the following conditions:

(i) Tenant shall have given Landlord six (6) months prior written notice of Tenant's intent to terminate the Lease ("Termination Notice");

(ii) Tenant shall have removed those of its readily removable trade fixtures and personal property, such as beds, office equipment, supplies and furniture and shall have repaired any damage to the Demised Premises caused thereby, it being agreed that Tenant shall not be obligated to remove its and its Affiliates trade fixtures and personal property which are affixed to the walls or floors of the Building at the expiration of the Primary Term or Renewal Term, as applicable, so long as the Demised Premises are returned to Landlord in "broom clean" condition;

(iii) Tenant shall have paid to Landlord all outstanding Base and Additional Rent and other obligations under the Lease accruing to the date that Tenant delivers possession of the Demised Premises to Landlord in accordance with this Lease and the Termination Notice.

(iv) Tenant shall have paid to Landlord, not later than sixty (60) days prior to the accelerated expiration date of the Primary Term as a result of issuance of the Termination Notice (the "Termination Fee Due Date"), a lease termination fee as follows:

(1) \$2,750,000.00 fee if Tenant elects to terminate the Lease at the end of the third (3rd) year; or

(2) \$1,000,000.00 fee if Tenant elects to terminate the Lease at the end of the fifth (5th) year.

(v) Tenant shall have paid to Landlord, on the Termination Fee Due Date, the unamortized balance of the leasing commission paid by Landlord to Colliers International based on a 120-month amortization term calculated from the Rent Commencement Date, calculated on a straight line basis without interest (the "Leasing Commission Payoff Amount").

(vi) Provided Tenant shall have complied with the provisions of this Article 1D, Tenant shall be relieved of all liability under the Lease except for any items of Additional Rent which accrued prior to the applicable termination date or an indemnity rights of Landlord which shall survive the termination of this Lease.

F. Tenant shall have the right, prior to the Commencement Date, to inspect the Demised Premises from time to time, for the purpose of evaluating the Demised Premises and the improvements and systems in place, and preparing for the installation of Tenant's Work and the process of seeking to obtain the Approvals. Without limiting the foregoing, in the event RE Builders Inc. ("REB") is <u>not</u> Tenant's contractor, Landlord shall have the right to have an observer engaged by Landlord at its expense to inspect the Tenant's Work while the same is being performed, provided that such observations shall not interfere with Tenant's Work. Such observer shall have the right, on Landlord's behalf, to approve or reject or impose conditions on any material changes to Tenant's Work which would differ from that as approved by Landlord pursuant to Article 6 below. In the event REB is selected as Tenant's contractor, Tenant agrees to appoint a Tenant representative who is available on short notice and who has the authority to approve changes in the scope of the Tenant's Work.

**ARTICLE 2**
**RENT**

A. The "Rent Commencement Date" shall occur sixty (60) days following the Commencement Date.

B. During the period between the Commencement Date and the Rent Commencement Date, Tenant shall pay all operating expenses, Real Estate Taxes, insurance and Utilities and perform and abide by all other covenants and obligations of Tenant hereunder other than the payment of Base Rent.

C. Beginning on the Rent Commencement Date and through the end of the first year of the Primary Term, Tenant shall pay Landlord (or such other person at such other place as may be designated in writing from time to time by Landlord), annualized base rent (the "Base Rent") in the amount of Eight Hundred Forty Thousand Dollars ($840,000.00), payable in equal monthly installments of Seventy Thousand Dollars ($70,000.00), in advance, on the first day of each month without notice or demand and without abatement, deduction or set-off of any amount other than as expressly permitted by this Lease. The Base Rent during each year of the Primary Term shall be increased by an amount equal to 1.75% of the Base Rent for the immediately preceding Lease Year.

D. The first "Lease Year" shall be the period commencing on the Commencement Date and ending on the last day of the month within which the twelfth (12th) month of this Lease occurs. Each Lease Year thereafter shall be the successive twelve (12) month period, except the last Lease Year of the Primary Term shall be fourteen (14) months. If the Commencement Date falls on a day other than the first day of a calendar month, minimum rent shall be pro-rated on an per diem basis from the Rent Commencement Date to the first day of the following calendar month, and such apportioned sum shall be paid on the Rent Commencement Date.

E. The term "Delivery Date" shall mean the later of the date that Tenant receives (i) the keys to the Demised Premises and (ii) a signed copy of this Lease. Notwithstanding the delivery of possession of the Demised Premises to Tenant, Landlord covenants and agrees to complete "Landlord's Work" as set forth in Exhibit B within the time frames herein and therein described. Landlord's Work may be completed before or simultaneously with Tenant's Work (hereafter defined), but not after Tenant's Work and shall be deemed substantially completed unless there shall remain incomplete items which would materially interfere with the progress of Tenant's Work.

F. In the event Tenant elects to renew this Lease for the first Renewal Term, the annual Base Rent for the first year of such first Renewal Term shall be Nine Hundred Ninety Six Thousand Dollars ($996,000.00), payable in equal monthly installments of Eighty Three Thousand Dollars ($83,000.00), in advance, on the first day of each month without notice or demand and without abatement, deduction or set-off of any amount other than as expressly permitted by this Lease. The Base Rent during each year of the first Renewal Term shall be increased by an amount equal to 1.75% of the Base Rent for the immediately preceding Lease Year.

G. In the event Tenant elects to renew this Lease for the second Renewal Term, the annual Base Rent for the first year of such second Renewal Term shall be One Million Eighty Six Thousand Dollars ($1,086,000.00), payable in equal monthly installments of Ninety Thousand Five Hundred Dollars ($90,500.00), in advance, on the first day of each month without notice or demand and without abatement, deduction or set-off of any amount other than as expressly permitted by this Lease. The Base Rent during each year of the second Renewal Term shall be increased by an amount equal to 1.75% in excess of the Base Rent for the immediately preceding Lease Year.

H. Each monthly installment of Rent shall be paid to Landlord in lawful money of the United States of America at the address of Landlord provided in Article 24 in advance, or by ACH transfer or direct deposit to a bank account designated by Landlord upon request by Tenant for such designation, on the first day of each month during the term hereof without notice or demand and without abatement, deduction or set-off of any amount other than as expressly permitted by this Lease.

I. If Tenant does not pay Rent and any other monies due Landlord from Tenant within five (5) business days of the due date, then Tenant shall pay Landlord a sum equal to five percent (5%) of the amount of the Rent not timely paid (the "Late Charge"). This Late Charge shall be in addition to any and all other monies due Landlord from Tenant and shall not preclude Landlord from exercising any of its rights or remedies as a result of any default by Tenant pursuant to this Lease including, but not limited to, the failure of Tenant to timely pay Rent to, or for the benefit of, Landlord.

J. In addition to any Late Charge imposed by Landlord upon Tenant for non-payment of Rent and any other monies due Landlord from Tenant, Landlord shall be entitled to interest at the Prime Rate of interest published by the Wall Street Journal plus four (4%) percent (the "Interest Rate") upon any monies not timely paid by Tenant to Landlord as provided herein. Interest, at the Interest Rate, shall be payable from the date which is one (1) month after the date when the monies were due Landlord until paid in full and before and after a judgment is entered by Landlord against Tenant.

K. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be

deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

L. "Additional Rent" shall include, but not be limited to, Real Estate Taxes, insurance as well as all other amounts due from Tenant hereunder, except Base Rent.

**ARTICLE 3**
**TAXES**

In addition to the Rent provided for in Article 2, Tenant agrees to make additional payments as follows:

A. Tenant shall be responsible for all real property taxes and general and special assessments (hereinafter, "Real Estate Taxes") which may be levied or assessed against the Demised Premises by any lawful authority for each calendar year or portion thereof commencing on the Rent Commencement Date included within the Term. For the purpose of this Lease, Real Estate Taxes shall mean all real property or equivalent taxes and assessments, regardless of how designated, including, but not limited to, use and occupancy taxes, special services district taxes, general or special assessments, water and sewer rents, solid waste disposal fees, and any other governmental impositions imposed, levied and/or assessed upon the Demised Premises of every kind and nature whatsoever, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof, which shall or may during the Term be levied, assessed or imposed on or against the Demised Premises or any portion thereof. For the avoidance of doubt, Real Estate Taxes shall include sums imposed in lieu of or in substitution for Real Estate Taxes otherwise described in this Article 3.A. Landlord represents and warrants that it has received no notice of any pending increase in the rate or assessment of the Demised Premises affecting real estate taxes, or of any planned or pending special services district taxes, general or special assessments (other than Real Estate Taxes), water and sewer rents, solid waste disposal fees, and any other governmental impositions, nor notice of any appeal filed by East Whiteland Township or the Great Valley School District from the current real estate tax assessment.

B. Except as otherwise provided herein, all Real Estate Taxes levied or assessed for any calendar year during the Term hereof shall be paid annually, semiannually, or more frequently as may be required by the applicable taxing authorities, by Tenant, but no more frequently than Landlord is required to make payment to the taxing authorities. Landlord shall deliver to Tenant promptly all Real Estate Taxes bills, including general and special assessment bills, levied or assessed for any calendar year or portion thereof included within the Term hereof on receipt. Tenant shall pay directly to the taxing authority the actual amounts of such bills no later than fifteen (15) days prior to the date Landlord is required to pay said Real Estate Taxes without penalty. A copy of a tax bill or assessment bill submitted by Landlord to Tenant shall at all times be sufficient evidence of the amount of Real Estate Taxes levied or assessed against the property to which such bill relates. Tenant shall furnish promptly evidence that the Real Estate Taxes have been paid. Landlord's and Tenant's obligations under this Article 3 shall

survive the expiration of the Term or any termination of this Lease. With respect to any fiscal year for Real Estate Taxes which does not coincide with a Lease Year, the parties shall pro-rate the Real Estate Taxes so that Tenant is only responsible for the Real Estate Taxes for the period within the applicable Primary Term or Renewal Term.

C. Upon the receipt of prior written approval of Landlord, such approval not to be unreasonably withheld, conditioned or delayed, Tenant may contest any Real Estate Taxes against the Demised Premises and attempt to obtain a reduction in the assessed valuation or tax rate upon the Demised Premises for the purpose of reducing any such taxes. In the event Landlord approves and upon the request of Tenant, but without expense or liability to Landlord, Landlord shall cooperate with Tenant and execute any documents which may be reasonably necessary and proper for any proceeding. If a tax reduction is obtained there shall be a subsequent reduction in Tenant's total Real Estate Taxes for such year, and any excess payments by Tenant shall be refunded by Landlord, without interest, when all refunds to which Landlord is entitled from the taxing authority with respect to such year have been received by Landlord. In the event Landlord desires to contest any Real Estate Taxes, Tenant agrees to cooperate with Landlord and execute any documents which may be reasonably necessary and proper for any proceeding at no cost to Tenant.

## ARTICLE 4
## REPAIRS, MAINTENANCE AND OPERATING EXPENSES

A. The parties agree that Tenant shall lease the Demised Premises on a "triple-net" basis and, except as hereafter expressly set forth, is responsible, at Tenant's expense, for 100% of all costs and expenses self-managing, maintaining, repairing and replacing, as necessary, the entire interior and exterior portions and areas of the Demised Premises and all systems thereof, during Tenant's occupancy, except for the following which shall be completed by Landlord at Landlord's expense (unless the need for the repair or replacement was caused by the act or neglect of Tenant, its agents, employees or contractors):

(i) Any costs incurred by Tenant which are incurred by reason of any defective design or the original construction of the Building, or defective work performed by Landlord, its agents or contractors for Tenant herein;

(ii) The replacement of the entire roof or repair to the structural and foundation elements of the Building on the Demised Premises, which structure and foundational elements are agreed to include the roof, exterior walls, windows, doors and skylights, and everything in the Building outside of the interior painted surface of all exterior walls of the Building, except as otherwise provided in Section 5 A (iii) and (iv);

(iii) The entire replacement of an HVAC unit, an elevator or the Emergency Generator (hereafter defined), unless the complete failure of the said unit

resulted from Tenant's failure to maintain regular service contracts thereof;

(iv) Repairs to utility lines to their point of entry into the Building and connection to the electrical panel box;

(v) The cost of repair or replacement as a result of any casualty or condemnation, which, with respect to casualty, arises from a loss from perils covered by the ISO Causes of Loss-Special Form (CP 10 30), or its equivalent, with coverage extended for the perils of flood and earthquake, or if such form is no longer commonly used for commercial buildings, its substantially equivalent replacement form;

(vi) Any cost associated with abatement or disposal of Hazardous Materials, except to the extent the presence of such Hazardous Materials is caused by Tenant or Tenant's agents, contractors, employees, subtenants, representatives, guests, or invitees; and

(vii) Repairs or replacements necessitated solely as a result of the negligence or willful misconduct of Landlord, or its agents, contractors or employees.

B. To the extent any repair or replacement by Tenant is a capital expenditure under generally accepted accounting principles ("GAAP"), the cost thereof exceeds $500.00 per repair or replacement (on a non-cumulative basis) and the anticipated useful life of the item so replaced extends beyond the remaining Primary Term or Renewal Term then in effect, then the cost thereof shall be prorated for such anticipated remaining useful life, and Tenant shall only be responsible for such prorated cost applicable to the remaining Primary Term or Renewal Term then in effect. In the event Tenant thereafter extends the term of the Lease, the portion previously paid by Landlord shall be reimbursed to Landlord by Tenant, as Additional Rent, (to the extent the remaining useful life of the repair or replacement is less than the Renewal Term), on the first month of the Renewal Term. Except in the event of emergency, prior to incurring such cost to be reimbursed in part by Landlord, Tenant shall provide Landlord an opportunity to review the bid for such work, which bid shall be subject to Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed. Other than emergent repairs and replacements, the failure of Tenant to obtain Landlord's approval for any work to be reimbursed in part by Landlord shall constitute a waiver by Tenant of the right to such reimbursement. Landlord shall reimburse Tenant for Landlord's share of such capital expenditures for which Landlord is obligated under this paragraph within thirty (30) days of Tenant's issuance of an invoice with evidence of payment.

C. Tenant shall secure, pay for and keep in force contracts with appropriate and reputable service companies providing for the regular and proper maintenance of HVAC equipment (at least semi-annually), the elevators, the Emergency Generator, security and alarm systems located within the Demised Premises, and copies of such contracts shall be furnished to Landlord upon Landlord's request.

D. Tenant's maintenance, repair and replacement obligation shall include compliance with all governmental regulations (other than regulatory compliance relating to the building in general as opposed to Tenant's specific use thereof);

E. Landlord agrees that Tenant shall be credited with any incentives or rebates Landlord receives for Real Estate Taxes, energy efficient or other similar programs.

F. Tenant agrees to provide Landlord by April 30 of each calendar year a statement of expenses incurred by Tenant with respect to Tenant's operation, maintenance, repair and replacements of the Demised Premises, during the preceding calendar year.

## ARTICLE 5
## TENANT'S ADDITIONAL COVENANTS

A. Tenant covenants at its sole cost and expense at all times during the Term and for such prior or subsequent time as Tenant occupies the Demised Premises or any part thereof:

(i) To perform promptly all of the obligations of the Tenant set forth in this Lease; and to pay when due the Base Rent and Additional Rent and all charges, rates and other sums which by the terms of this Lease are to be paid by Tenant.

(ii) To use the Demised Premises only for the Permitted Uses, and to procure, or cause its Affiliate intending to operate its business at the Demised Premises to procure, all licenses and permits necessary or desirable therefor at Tenant's or its Affiliate's sole expense except as otherwise provided in this Lease; provided that Landlord shall reasonably cooperate with Tenant's or its Affiliate's procurement of any such licenses and permits, with Tenant paying all reasonable costs related thereto.

(iii) Except as otherwise provided herein, to keep the Demised Premises in good order, condition and repair, during the Term, reasonable use and wear and damage by casualty only excepted, including the maintenance, repair, and replacement of filters, light bulbs, broken ceiling tiles or other finished ceiling materials, broken glass on the interior of the Premises, broken finished flooring materials, and broken doors and windows, as well as signs, broken fixtures and interior walls, interior building appliances and systems at the point where such systems solely serve the Demised Premises, unless such repair is necessitated by the negligence or fault of the Landlord or failure of the Landlord to maintain the Demised Premises; and to make all repairs and replacements (except those repairs and replacements which Landlord agrees to make hereunder) and to do all other work necessary for the foregoing purposes. By way of clarification, Landlord, not Tenant shall be responsible, at Landlord's expense for replacement of doors, windows and skylights arising from a material defect in design, construction or installation requiring replacement, as opposed to maintenance, repair and replacement arising from normal use and ordinary wear and tear which shall be Tenant's responsibility.

(iv) To make all repairs, alterations, additions or replacements to the Demised Premises and equipping of the Demised Premises which safety equipment required by any law or ordinance or any other regulation of any public authority directly relates to the Primary Intended Use, except to the extent such repair and/or construction is necessitated due to the actions or inactions of the Landlord or Landlord's agents, contractors, or employees (collectively, the "Landlord Group"); to pay all municipal, county, or state taxes assessed against the leasehold interest hereunder or against Tenant's personal property of any kind on or about the Demised Premises; and to comply with the orders, regulations, variances, licenses and permits granted by governmental authorities with respect to zoning, building, fire, health and other codes, regulations, ordinances or laws applicable to the Demised Premises, and the conditions, use or occupancy thereof, except that Tenant may defer compliance so long as the validity of any such order, regulation, code, ordinance or law shall be contested by Tenant in good faith and by appropriate legal proceedings, if Tenant first gives Landlord appropriate assurance reasonably satisfactory to Landlord against any loss, cost or expense on account thereof, and provided such contest shall not subject Landlord to criminal penalties or civil sanctions, loss of property or material civil liability. Notwithstanding the foregoing, Tenant shall not be deemed in violation of this Lease on account of any condition on or at the Demised Premises existing prior to the commencement of the Primary Term of this Lease. Further, Tenant shall make structural alterations to the Demised Premises or improvements or replacements to comply with applicable laws if the need for the same arises due to Tenant's Work or subsequent alterations performed by Tenant with respect to the Demised Premises, or if required due to the specific nature of Tenant's use or occupancy of the Demised Premises.

(v) To procure at Tenant's sole expense all necessary permits and licenses before undertaking any work on the Demised Premises; to do all such work in compliance with the applicable provisions; to do all such work in good and workmanlike manner employing materials of good quality and so as to conform with all applicable zoning, building, fire, health and other codes, regulations, ordinances and laws; to pay promptly when due the entire cost of any work on the Demised Premises undertaken by Tenant so that the Demised Premises shall at all times be free of liens for labor and materials ordered or contracted for by Tenant; to require such contractors employed by Tenant to carry worker's compensation insurance in accordance with statutory requirements and comprehensive public liability insurance covering such contractors on or about the Demised Premises in amounts that at least equal the limits set forth in this Lease, and to submit certificates evidencing such coverage to Landlord prior to the commencement of such work; and to hold Landlord harmless and indemnified from all injury, loss, claims or damage to any person or property occasioned by or growing out of such work, except to the extent the same arises from the negligence or willful misconduct of Landlord or the Landlord Group.

(vi) At all times during the course of any construction or renovation of any improvements or alterations on the Demised Premises by Tenant, to carry completed value form insurance on all work being performed on the interior of the Demised Premises, in such amounts as agreed upon by Tenant and Landlord, to afford one hundred percent (100%) coverage against loss, and owner's contingent or protective liability insurance naming

Landlord, with combined single limit coverage at least equal to the limits set forth in Article 15 of this Lease, and worker's compensation insurance covering all persons working on the job site or in connection with such construction. All certificates therefor shall be deposited with the holder of any mortgage on the Demised Premises or with Landlord, as Landlord in writing may elect. Each such policy shall be non-cancellable with respect to the interest of Landlord and the holders of any mortgages or other additional interests on the Demised Premises identified as an additional insured without at least twenty (20) days' prior written notice thereto, except in the event of nonpayment of premium in which case ten (10) days shall be sufficient or such notice as reasonably permitted by a nationally recognized insurance carrier.

(vii) Tenant shall arrange at its sole cost and expenses for regular cleaning of the Building.

(viii) That Tenant provides the following warranties and representations, upon which Landlord may rely in agreeing to lease the Demised Premises to Tenant in accordance with the terms of this Lease:

(1) that Tenant has been duly organized and is validly existing and is in good standing in the State of Delaware;

(2) that Tenant has been duly qualified as a foreign limited liability company and is, as of the date hereof, in good standing to transact business in the Commonwealth of Pennsylvania;

(3) that the officers, managers or members executing this Lease on Tenant's behalf have been duly authorized by all necessary action to execute the same, and that upon the execution hereof this Lease shall be the valid and binding obligation of Tenant.

B. Negative Covenants. Tenant covenants at all times during the Initial Term and any Renewal Term(s) and for such further time as Tenant occupies the Demised Premises or any part thereof:

(i) Not to injure, overload, deface or otherwise harm the Demised Premises; nor commit any nuisance; nor permit the emission of any objectionable noise or odor; nor make, allow or suffer any waste; nor make any use of the Demised Premises which is improper, offensive or contrary to any law or ordinance or which will invalidate any insurance.

(ii) Not abandon the Demised Premises or any portion thereof. Notwithstanding the foregoing, this Article shall not be interpreted to require Tenant's continuous operation of the Demised Premises.

(iii) Not, either with or without negligence, to cause or permit the escape, disposal or release by Tenant or its agents, contractors, or employees (collectively "Tenant Group") of any Hazardous Materials, as hereinafter defined, in, on, under or about the Demised Premises in violation of applicable laws. Tenant shall not allow the storage, use, generation,

creation, disposal, or transportation of such Hazardous Materials in any manner not sanctioned by law for the storage, use, generation, creation, disposal, or transportation of such Hazardous Materials, nor allow to be brought into or upon the Demised Premises any such Hazardous Materials except for use in the ordinary course of Tenant's business consistent with its Permitted Uses, including its on-site medical laboratory, and shall be permitted to utilize medical supplies and medical sharps typically used in medical settings, all in accordance with applicable laws, ordinances, statutes, governmental rules and regulations. All medical supplies shall be disposed of in accordance with any applicable laws, ordinances, statutes, governmental rules and regulations, and medical best practices. Tenant shall indemnify, protect, defend and hold Landlord and the Landlord Group harmless from and against any and all claims, demands, losses, liabilities, penalties and costs (including, without limitation, reasonable attorneys' fees, whether or not suit is brought) arising directly or indirectly from or out of, or in any way connected with the presence, leakage, escape, emanation, migration or release caused by the Tenant or the Tenant Group, of any Hazardous Materials on, under, above or about the Premises or the Premises, except to the extent any such Hazardous Materials were introduced or exacerbated by Landlord or the Landlord Group. Tenant shall, at its sole cost and expense and without reimbursement or contribution by Landlord, perform all necessary remedial work in accordance with all applicable laws and without any abatement of Rent, to remediate all Hazardous Materials present in the soil, groundwater, or soil vapor on or under the Demised Premises or the Demised Premises as a result of the acts or omissions of Tenant and/or the Tenant Group and not by Landlord or the Landlord Group. This Article shall survive the expiration or termination of this Lease.

## ARTICLE 6
## TENANT'S WORK

A. When Landlord has completed Landlord's Work, Landlord shall deliver possession of the Demised Premises to Tenant, and Tenant agrees to accept possession thereof and to proceed with due diligence to perform Tenant's Work (as hereinafter defined) and/or to install its fixtures, furniture, equipment and personal property therein, all as further described below. Tenant shall comply with all requirements set forth in Exhibit C and in this Lease with regard to the performance of Tenant's Work. In the event of any dispute as to work performed or required to be performed by Landlord or Tenant pursuant to Exhibit C, the certificate of Tenant's architect or engineer shall be conclusive in the absence of manifest error. Tenant agrees to furnish to Landlord a Certificate of Occupancy (or its equivalent), from applicable local authorities.

B. Following the later of the Delivery Date and the obtaining of the Township Approvals and Construction Approvals described in Section 1 (D), Tenant, at its sole cost and expense, subject to Article 6A hereof (tenant allowance), shall fit up the Demised Premises in accordance with (i) a space plan to be prepared by an architect selected by Tenant ("Tenant's Architect"), to be supplied by Tenant to Landlord for Landlord's approval, which approval will not be unreasonably withheld, conditioned or delayed, (ii) final plans and specifications (the "Plans") which shall be prepared by Tenant's Architect based upon the Space Plan, and (iii) mechanical, electrical and plumbing drawings ("MEPs" and together with the Plans, the

"Construction Documents") to be prepared by Tenant's engineer, who must be approved in advance by Landlord, all in accordance with Tenant's Permits, and with federal, state and local building and zoning laws ("Tenant's Work"). All of Tenant's costs and expenses incurred pursuant to the preceding sentence shall be subject to the allocation between Landlord's Initial Contribution and Tenant's Contribution as described in Article 6A below. The Construction Documents shall comply with all applicable laws, ordinances, rules and regulations (together, "Laws") of all governmental authorities having jurisdiction. Tenant agrees to direct its architect to make all required changes to Tenant's final Construction Documents which are requested by the applicable governmental authorities to obtain the Approvals. Any and all construction work shall be performed in accordance with all Laws and in a good and workmanlike manner, using commercially reasonable and generally accepted construction practices and pursuant to validly issued permits. Tenant shall be responsible for all building permit fees, impact fees directly related to its use of the Demised Premises (in accordance with the terms below) and all other fees related to the Tenant's use of the Demised Premises as well as those improvements to the Demised Premises required for Tenant to use the Demised Premises for its Permitted Use.

C. Neither the preparation of the Plans by Tenant's Architect, nor the review or approval thereof by Landlord constitutes (i) a representation or warranty by Landlord that such Plans either (A) are complete or suitable for their intended purpose, or (B) comply with applicable law; it being expressly agreed by Tenant that Landlord assumes no responsibility or liability whatsoever to Tenant or to any other person or entity for such completeness or suitability, or (ii) an approval or consent of any type by Landlord, whether express, implied or otherwise.

D. Tenant shall have three (3) weeks following the completion of the construction documents to obtain general contractor bids/prices.

E. In the event Tenant elects to engage a general contractor to complete Tenant's Work other than REB (subject to Landlord's written approval which shall not be unreasonably delayed, conditioned or withheld), the Commencement Date of this Lease shall be the earlier of (i) the date the Demised Premises is open to the public for business or (ii) 180-days following the date Tenant obtains the Township Approvals and Construction Approvals, subject to extension by reason of Permitted Delays (as defined below) delaying substantial completion of Tenant's Work within such 180 day period.

F. Tenant shall coordinate with REB (or Tenant's alternate general contractor) for Tenant's early access to the Demised Premises, not later than three weeks prior to the anticipated issuance of the certificate of occupancy, for the purpose of installing Tenant's equipment, fixtures and furnishings. Nothing in this subsection shall affect the determination of the Commencement Date or the Rent Commencement Date.

G. Tenant agrees that it shall pay for standard GC overheard and profit as of the cost of Tenant's Work. No additional construction management fee shall be due Landlord.

## ARTICLE 6A
## TENANT'S INITIAL IMPROVEMENT ALLOWANCE

A. The parties hereto estimate that the cost of Tenant's Work, inclusive of the Emergency Generator defined in Section 13D, shall be $4,000,000.00.

B. Landlord shall contribute an amount equal to seventy-five percent (75%) of the total costs incurred by Tenant to construct Tenant's Work, which would be $3,000,000.00 based on the estimate of $4,000,000.00 ("Landlord's Initial Contribution"), as more particularly hereinafter set forth, subject to the provisions of subsection F. below. Landlord's Initial Contribution may be applied only against the costs incurred by Tenant for architect's, engineer's and consultants' fee, permitting fees related to Tenant's Work, labor engaged in the construction of Tenant's Work, hook up costs related to the Emergency Generator, materials delivered to the Demised Premises in connection with Tenant's Work, cabling, telecommunication and project management fees. For the avoidance of doubt, Landlord's Initial Contribution shall be exclusive of the cost to complete Landlord's Work, excepting the Emergency Generator installation which is included as part of Landlord's Initial Contribution to Tenant's Work.

C. Tenant shall pay twenty-five percent (25%) balance, which would be $1,000,000.00 based on the estimate of $4,000,000.00 ("Tenant's Contribution") towards Tenant's Work.

D. Provided Tenant complies with the provisions of subsection C. of this Article 6A, above, and is not in default under the Lease, beyond any applicable notice and cure period, Landlord shall pay to Tenant (or REB, as Landlord elects) Landlord's Initial Contribution in installments based upon requisitions for same in accordance with a standard AIA form of application for payment issued by Tenant's general contractor and approved by Tenant for work substantially completed as described in such application. Landlord shall make the payment within ten (10) days of receipt of the completed application, and shall not be required to fund more than two applications for payment in any calendar month.

E. Tenant's Requisition. Each requisition, submitted pursuant to paragraph D hereof, shall be accompanied by:

(i) Copies of partial waivers of lien from all contractors, subcontractors, and materialmen, with respect to all work and materials that were the subject of the previous progress payments, provided that, if approved by Landlord's lender in writing, Tenant need not supply a partial waiver from subcontractors or materialmen for work for which payment is being made to Tenant's general contractor where the amount of the subcontract is less than $25,000.00, provided that Tenant's contract contains a commercially reasonable indemnity against mechanic's liens from such general contractor;

(ii) If the work for which an application for payment is submitted is of a type which Tenant's architect has been engaged to review and inspect such work, a written certification from Tenant's architect that the work for which the requisition is being made has been substantially completed in accordance with the Plans and Specifications approved by Landlord; and

(iv) Such other documents and information as shall be reasonably required by Landlord customarily required by construction lenders as a condition to funding.

F. Provided that REB is Tenant's general contractor, (1) Landlord shall advance Landlord's Initial Contribution prior to Tenant's funding Tenant's Contribution, until the total cost of Tenant's Work reaches $4,000,000.00 (whereupon Tenant shall have contributed $1,000,000.00); and (2) if the cost of Tenant's Work exceeds $4,000,000.00, any costs over $4,000,000.00 to be advanced simultaneously and pro-rata by Landlord and Tenant on a pro rata 3:1 basis (3 to Landlord and 1 to Tenant). In the event the contractor's estimate exceeds $6,000,000.00 either Tenant or Landlord may terminate this Lease by written notice to the other within the 15-day period following receipt of the contractor's estimate. If REB is not Tenant's general contractor, the parties shall advance their respective pro-rata contributions simultaneously when payment is required under the construction contract. For the avoidance of doubt, in the event the cost of Tenant's Work is less than $4,000,000.00, Landlord and Tenant shall share in the cost savings in the same 3:1 ratio. For example, if the total cost of Tenant's Work equals $3,700,000.00, Landlord shall advance the first $2,775,000.00 as Landlord's Initial Contribution and Tenant the last $925,000.00 as Tenant's Contribution.

G. Within thirty (30) days from the date hereof, Landlord shall demonstrate to Tenant's reasonable satisfaction that Landlord has liquid equity sufficient to fund Landlord's Initial Contribution, or a binding, enforceable commitment from a construction lender to fund such Landlord's Initial Contribution, in form satisfactory to Tenant.

## ARTICLE 6B
## TENANT'S LEASE RENEWAL IMPROVEMENT ALLOWANCES

A. In the event Tenant exercises one or both of the Renewal Terms in accordance with the terms and provisions described in Article 1 B hereof, Landlord agrees, for each such Renewal term so exercised, to contribute to Tenant an amount equal to $240,000.00 toward the costs incurred by Tenant to "refresh/upgrade" Tenant's Work ("Landlord's Renewal Contribution"), as more particularly hereinafter set forth.

B. Provided Tenant complies with the provisions of Article 6B ( C), below, and is not in default under the Lease, beyond any applicable notice and cure period, Landlord shall pay to Tenant when Tenant makes a requisition for same in accordance with the same procedures applicable to disbursements of Landlord's Initial Contribution under Article 6 above, the amount of Landlord's Renewal Contribution meeting the funding approval

requirements, except that there shall be no pro-ration between Landlord's Renewal Contribution and any costs incurred by Tenant in excess of Landlord's Renewal Contribution.

C. Any portion of Landlord's Renewal Contribution not used to "refresh/upgrade" Tenant's Work may be used by Tenant for alterations, purchases of equipment, or added to the Landlord's Renewal Contribution for the next Renewal Term, as Tenant may elect. Such Landlord's Renewal Contribution can be used at any time during the current or any future Renewal Term for any such permitted purposes, and Landlord agrees to escrow such Landlord's Renewal Contribution with either a title insurance agency, licensed real estate broker, or law firm as Tenant may designate, to assure such funds are available to be drawn when used by Tenant.

## ARTICLE 7
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

A. Upon the request of the holder of any note secured by a mortgage on the Demised Premises, Tenant shall, in writing, subordinate this Lease and Tenant's rights hereunder to any such note and mortgage and agree that (i) no action taken by the mortgagee to enforce such mortgage by reason of default thereunder shall terminate this Lease or invalidate or constitute a breach of any of the terms of conditions hereof and (ii) Tenant will attorn to the purchaser at any foreclosure sale or the grantee in any conveyance in lieu of foreclosure and recognize such purchaser or grantee as Landlord of the Demised Premises. Upon written request of such purchaser or grantee, Tenant shall execute instruments as may be necessary or appropriate to evidence such attornment.

B. In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust, upon any such foreclosure sale or sale under a power of sale Tenant agrees to recognize and attorn to such beneficiary or purchaser as the Landlord under this Lease, provided Tenant's rights under this Lease continue unabated except in the event of a default or breach by Tenant.

C. Landlord agrees to obtain a Subordination, Non-Disturbance and Attornment Agreement from its current lender(s) and the ground lessor, if any, and deliver same to Tenant with respect to any existing mortgage against the Demised Premises, within thirty (30) days from the date of this Lease, in such form as Tenant and the applicable lender shall reasonably approve. Landlord will also obtain and deliver to Tenant a Subordination, Non-Disturbance and Attornment Agreement in such form as Tenant and the applicable lender shall reasonably approve prior to the effectiveness of any future ground lease or financing and prior to any obligation by Tenant to execute a written subordination agreement. Landlord shall request the mortgage lender who will be financing, inter alia, Landlord's Initial Contribution under Article 6A to provide its form of Subordination, Non-Disturbance and Attornment Agreement for Tenant's review at the time of Landlord's application for such financing.

**ARTICLE 7A**
**REGULATORY COMPLIANCE**

Landlord shall pay any and all fines or penalties assessed by any governmental authority if the Demised Premises, in general, fails to meet codes and regulations of governmental authorities during the Term of this Lease, unless the violation results from any improvements or alterations made by Tenant or Tenant's Primary Use. Tenant shall pay any or all other fines or penalties for noncompliance or violation of codes, laws, rules or regulations of governmental authorities during the Term of this Lease with respect to the specific use or occupancy of the Demised Premises by Tenant. In addition, Tenant agrees to comply in all material respects with the reasonable regulations and requirements of any insurance underwriter, inspection bureau or similar agency with respect to improvements to the Demised Premises installed by Tenant. Landlord represents that as of the date of this Lease it has received no notices of noncompliance from any governmental authority which remain uncured.

**ARTICLE 8**
**OMITTED**

**ARTICLE 9**
**ENVIRONMENTAL MATTERS**

A. For purposes of this Lease, the term "Hazardous Material" shall mean any substance, material or waste as to which liability or controls may be imposed under Environmental Laws. The term "Environmental Laws" shall mean all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all common law and all other legal requirements concerning public health and safety, worker health and safety, pollution or protection of the environment.

B. Landlord has furnished to Tenant copies of all environmental reports, audits, assessments and other material environmental documentation relating to the Demised Premises which are in its possession or under its reasonable control.

C. Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all losses, liabilities, damages, injuries, costs, expenses and claims of any and every kind whatsoever (including without limitation, court costs and attorneys' fees) (collectively "Losses") directly caused by (i) any spills, releases, disposal or discharges of, contamination by, or exposure to, Hazardous Materials at, onto, beneath, from or affecting the Demised Premises ("Hazardous Material Releases") to the extent first caused by the operation or use of the Demised Premises by Tenant or its employees or its agents or contractors during the Term; (ii) the presence of Hazardous Materials that Tenant brings or allows its employees or agents to bring onto the Demised Premises during the Term, or (iii) the failure by Tenant to comply with applicable Environmental Laws.

D. Landlord shall indemnify, defend, and hold harmless Tenant from and against any and all Losses arising out of or resulting from (i) any Hazardous Material Releases, whenever caused, arising or occurring, except to the extent first caused by the operation or use of the Demised Premises by Tenant or its employees or agents during the Term; (ii) the presence of Hazardous Materials at, on, or under the Demised Premises on or prior to the Commencement Date or brought onto the Demised Premises following the expiration or termination of this Lease; (iii) failure by Landlord to comply with applicable Environmental Laws; and (iv) failure of any other person or entity prior to the Commencement Date or following the expiration or termination of this Lease to comply with Environmental Laws. In the event of any governmental or court order or ongoing investigation or cleanup concerning Hazardous Materials on the Demised Premises prior to the Commencement Date (not first caused by the action of Tenant or Tenant's agents, contractors, or employees) that precludes Tenant from reasonable operation of its business on the Demised Premises, Tenant may cease operating and Rent and all other charges shall be abated until such time as Tenant may resume reasonable operation of its business on the Demised Premises. In the event a Hazardous Material Release is discovered (which existed prior to the date hereof) and which poses a clear threat to the safety and health of Tenant's employees and patients and which cannot be abated within one hundred twenty (120) days of discovery, Tenant may by written notice to Landlord terminate this Lease.

E. The foregoing indemnities shall survive the termination or expiration of this Lease.

F. Each party shall promptly notify the other upon becoming aware of (i) any claims or demands, or any enforcement, cleanup or other regulatory or judicial action, threatened, made, or initiated with respect to the Demised Premises pursuant to Environmental Laws, including without limitation those relating to the presence or release of any Hazardous Material on the Demised Premises or the migration thereof from or to any other property; and (ii) the imposition of any lien arising under Environmental Laws on the Demised Premises.

G. Without limiting the generality of Article 9, Tenant shall comply with all laws pertaining to the generation, handling, storage, processing, transportation and disposal of medical, infectious or chemotherapeutic materials or waste including, without limitation, 35 P.S. § 6019.1 et seq. and 25 Pa. Code Chapters 271 through 285.

## ARTICLE 10
## ALTERATIONS

A. Tenant shall make no structural changes, additions or improvements in or to the Demised Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Tenant shall be permitted, from time to time, to make interior and exterior non-structural alterations to the Demised Premises, or any part thereof, which, with respect to any single alteration project do

not exceed $100,000.00 in cost, or which are primarily cosmetic or decorative, without Landlord's prior consent, but with respect to any non-cosmetic project, after prior written notice to Landlord. Tenant shall obtain all required building permits, licenses and other governmental approvals as may be required in connection with same, and shall cause all alterations or changes to be performed in a good and workmanlike manner. In the event any permitted alterations are made by Tenant which in whole or in part relate to the electrical or plumbing systems, Landlord shall be provided a full set so plans prior to the commencement of any such work.

B. In addition to the provisions of Article 10 A, in the event elected by Tenant, Landlord agrees to assist Tenant, at no material expense to Landlord in obtaining approval for an expansion of the Building. All necessary design work and the cost of the construction thereof shall, unless otherwise agreed in writing, be at the sole cost and expense of Tenant.

## ARTICLE 11
## FIXTURES, PERSONAL PROPERTY AND SIGNS

A. Any trade fixtures, furniture, supplies, business equipment, inventory, trademarked items, signs, and other removable personal property installed in or on the Demised Premises by Tenant at its expense or owned by Tenant at or after the Commencement Date ("Tenant's Property") shall remain the property of the Tenant. Landlord agrees that Tenant shall have the right, at any time or from time to time during the Term, to remove any and all of Tenant's Property or add additional items of Tenant's Property. Tenant at its expense shall repair any damage occasioned by the installation or removal of Tenant's Property.

B. Tenant may install, at its sole cost and expense, signage on the Building in compliance with all local ordinances and codes. Tenant agrees to maintain all signs in good condition and to make all repairs required because of the installation and maintenance of signs including, but not limited to, any roof repairs that may be required because of the installation and maintenance of signs. Tenant further agrees to save harmless and indemnify Landlord from and against any and all losses, damages, claims, suits or actions for any damage or injury to person or property caused by the erection and maintenance of such signs or parts thereof, and insurance coverage for such signs shall be included in the comprehensive public liability policy which Tenant is required to furnish.

## ARTICLE 12
## LIENS

Tenant shall not permit to be created nor to remain undischarged any lien, encumbrance or charge upon the Demised Premises arising out of any work or claim of any contractor, mechanic, laborer or supplier of material to Tenant. If any lien or notice of lien on account of an alleged debt of Tenant or any notice of contract by a party engaged by Tenant or Tenant's contractor to work in the Demised Premises shall be filed against the Demised Premises, Tenant shall, within thirty (30) days after notice of the filing thereof, cause the same to be discharged of record by payment, deposit or bond and shall furnish evidence of such discharge to Landlord.

## ARTICLE 13
## UTILITIES

Landlord at its expense agrees to cause the necessary mains, conduits and other facilities to be provided to the Demised Premises in order to make water, sewer, gas, phone and electricity ("Utilities") available to the Demised Premises.

A. All charges for the use and consumption of Utilities within the Demised Premises from the commencement of Tenant's Work through the Commencement Date shall be paid 75% by Landlord and 25% by Tenant without regard to Article 6A (F).

B. From and after the Commencement Date and during the Term of the Lease, Tenant shall be solely responsible for and promptly pay all charges for the use and consumption of Utilities within the Demised Premises and shall cause the accounts for such Utilities to be in the name of Tenant.

C. Provided not caused by the negligence or intentional misconduct of Landlord, Landlord shall not be liable to Tenant for abatement of rent if the utilities or services are interrupted or terminated because of necessary repairs, installations, or improvements, or any cause beyond the Landlord's reasonable control, nor shall any such interruption or termination relieve Tenant of the performance of any of its obligations hereunder.

D. Tenant shall not install any equipment which could exceed the capacity of any utility facilities servicing the Demised Premises, and if any equipment installed by Tenant requires additional utility facilities the same shall be installed by Tenant in compliance with all code requirements.

E. Landlord, at its expense (and as part of Landlord's Initial Contribution), shall install an emergency generator ("Emergency Generator") at the Demised Premises capable of enabling Tenant to continue all operations for patient care at the Building, or as required to comply with regulatory guidelines or requirements, without interruption up to a cost not in excess of $450,000.00, the selection of which Emergency Generator shall be approved by Tenant. Tenant shall be responsible for and bear the cost of, any maintenance and repair thereof following the expiration of the manufacturer's warranty, if any. Any such warranty shall be in the name of, or if assignable, assigned to, Tenant.

## ARTICLE 14
## DAMAGE TO DEMISED PREMISES

In the event the Demised Premises is hereafter damaged or destroyed or rendered partially untenantable for Tenant's use by fire or other insured casualty or by fire or other casualty (a "Casualty") which should have been insured under the coverage which Landlord is

obligated to carry pursuant to Article 15 hereof, then, within sixty (60) days of the Casualty (unless not feasible due to the nature of the Casualty), Landlord shall commence to repair said Demised Premises and within one hundred twenty (120) days after commencement of such repair (unless not feasible due to the nature of the Casualty) restore the Demised Premises to substantially the same condition in which it was immediately prior to the occurrence of the Casualty, except as otherwise provided in this Article 14. From the date of such Casualty until the Demised Premises is so repaired and restored, Rent and all other charges and items payable hereunder shall abate in such proportion as the square footage of the part of the Demised Premises thus destroyed or rendered untenantable bears to the total square footage of the Demised Premises. If the damage is such that the Demised Premises is wholly untenantable for Tenant's use or is such that it cannot be repaired or restored for Tenant's reasonable use for one hundred twenty (120) days or more after the Casualty, either Party shall have the right to terminate this Lease by notice sent to the other Party within thirty (30) days after such Casualty, except that if Landlord elects to terminate this Lease pursuant to this sentence, then Tenant shall have the right to void such termination and elect to complete the repairs and restoration, in which event Landlord shall assign to Tenant all rights under Landlord's insurance policies and cooperate with Tenant in recovering insurance proceeds and completing restoration. Any costs incurred by Tenant in excess of available insurance proceeds up to the insurance deductible shall be reimbursed by Landlord to Tenant. If said notice of termination is given as provided above, and Tenant does not elect to void termination by Landlord as provided above, then this Lease shall terminate and Rent and all other charges shall abate as aforesaid from the date of such Casualty (except that Rent for portions of the Demised Premises used by Tenant after the Casualty shall not abate), and Landlord shall promptly repay to Tenant any Rent paid in advance for the period after the termination which has not been abated. Real Estate Taxes shall be prorated as of the date of termination based on the last ascertainable tax bill if Tenant owes any Real Estate Taxes as of such date.

## ARTICLE 15
## INSURANCE

A. Landlord agrees to carry during the Term hereof all risk property insurance covering fire and extended coverage, vandalism and malicious mischief, rent insurance, sprinkler leakage and all other perils of direct physical loss or damage, and other coverages customary for similar buildings in the vicinity, insuring the Building (including the Demised Premises) and the improvements and betterments located in the Building (including the Demised Premises) and all appurtenances thereto (excluding Tenant's Property) for the full replacement value thereof, subject to a commercially reasonable deductible not in excess of $10,000.00. Tenant shall pay to Landlord, within 15-days of presentation of the invoice therefore, as Additional Rent an amount equal to the cost of such insurance. Landlord shall supply to Tenant a certificate evidencing such insurance, and if requested by Tenant, a copy of the policies referenced in the certificate, which insurance shall not be cancellable except upon thirty (30) days prior written notice to Tenant (if the policy will permit such thirty (30) day notice period), or ten (10) days in the event of non-payment of premium, or if a thirty (30) day notice period is not available.

B. Tenant agrees to carry, at Tenant's sole cost and expense, Commercial General Liability insurance on the Demised Premises during the Term covering Tenant, Landlord, Joseph Wakim and Kenneth Sadanaga as their interests may appear, and giving Landlord and Tenant a minimum of thirty (30) days' written notice by the insurance company prior to cancellation, termination or change in such insurance (except for nonpayment of premium in which case the notice shall be at least ten (10) days). Such insurance shall be for limits of not less than Five Million Dollars ($5,000,000) combined Bodily Injury and Property Damage Liability in separate limits for each of the following: General Aggregate, Products-Completed Operations Aggregate, Each Occurrence, Personal & Advertising Injury, and Fire Damage, limits of One Million Dollars ($1,000,000). Tenant also agrees to carry, at Tenant's sole cost and expense, during the Term hereof all risk property insurance covering fire and extended coverage (ISO Causes of Loss-Special Form (CP 10 30), or its equivalent, with coverage extended for the perils of flood and earthquake), vandalism and malicious mischief, sprinkler leakage and all other perils of direct physical loss or damage, and business interruption insurance, insuring the Tenant's Property for the full replacement value thereof, subject to commercially reasonable deductibles. Landlord agrees that Tenant may satisfy its property and liability insurance obligations in this Article 15 by a blanket insurance policy maintained by Tenant or its parent covering the Tenant's personal property and trade fixtures at the Demised Premises and other properties, and for its liability insurance obligations through a combination of commercial liability and umbrella liability policies. Tenant shall supply to Landlord a certificate evidencing such insurance, and if requested by Landlord, a copy of the policies referenced in the certificate, which insurance shall not be cancellable or adversely and materially modified except upon thirty (30) days prior written notice to Landlord, or ten (10) days in the event of non-payment of premium.

C. Landlord agrees that it shall not have any right, title or interest in and to Tenant's insurance covering Tenant's Property located on or within the Demised Premises or any proceeds therefrom.

D. The policies maintained by Tenant pursuant to this Article 15 shall (a) be on an occurrence basis, (b) provide primary coverage and not call upon any other insurance procured by other parties for defense, payment or contribution, (c) contain endorsements requiring a minimum of thirty (30) days' advance written notice to named insureds (including additional named insureds), or ten (10) days' advance written notice for non-payment of premiums, of any cancellation or reduction in coverage and (d) shall waive all rights of setoff, counterclaim, deduction or subrogation against Landlord. Any such policy may be a so-called blanket policy covering additional locations, provided that such coverage is not diminished or limited by virtue of such coverage being provided by a blanket policy as opposed to an individual policy. On the Commencement Date, and at least fifteen (15) days prior to the expiration of any existing policy, Tenant will provide the Landlord with such evidence of the insurance required by this Lease. All liability insurance policies carried by Tenant shall name Landlord as an additional insured.

E. Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any Casualty or

hazard covered or required hereunder to be covered in whole or in part by insurance on the Demised Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof. This waiver shall not be required if the insurance carrier charges an additional premium in order to provide such waiver and the party benefitting from the waiver does not agree to pay the additional premium after notice of such charge.

**ARTICLE 16**
**INDEMNIFICATION**

A Tenant hereby indemnifies and holds Landlord harmless from and against any and all claims, demands, liabilities and expenses, including reasonable attorneys' fees, arising from Tenant's use of the Demised Premises, or from any act, or any omission to act, in or about the Demised Premises by Tenant or its agents, employees, contractors or invitees, except to the extent caused by Landlord's negligence or willful misconduct. In the event any action or proceeding shall be brought against Landlord by reason of any such claim, Tenant shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord.

B Landlord hereby indemnifies and holds Tenant harmless from and against any and all claims, demands, liabilities and expenses, including reasonable attorneys' fees, arising from any actions or from acts, or any omission to act, in or about the Demised Premises by Landlord or its agents, employees, contractors or invitees, except to the extent caused by Tenant's negligence or willful misconduct. In the event any action or proceeding shall be brought against Tenant by reason of any such claim, Landlord shall defend the same at Landlord's expense by counsel reasonably satisfactory to Tenant.

**ARTICLE 17**
**ASSIGNMENT, SUBLETTING AND OWNERSHIP**

A Except as expressly set forth herein, Tenant shall not assign, mortgage, pledge, encumber, or otherwise transfer this Lease, whether by operation of law (including by merger) or otherwise, and shall not sublet, or permit, or suffer the Premises or any part thereof to be used or occupied by others, without Landlord's prior consent in each instance, which consent shall not be unreasonably conditioned, withheld or delayed. Any assignment, sublease, mortgage, pledge, encumbrance or transfer in contravention of the provisions of this Article 17, subject to Tenant's rights to notice and cure under Article 19 below, shall be void and shall constitute an Event of Default.

B. Landlord's consent to any assignment, transfer or subletting shall not relieve Tenant from the obligation to obtain Landlord's consent to any further assignment, transfer or subletting. In no event shall any permitted subtenant assign, transfer or encumber its sublease

or further sublet any portion of its sublet space, or otherwise suffer or permit any portion of the sublet space to be used or occupied by others

C Provided that no Event of Default then exists, Landlord's consent (if required under this Article 17) to the proposed assignment, transfer or subletting shall be granted or denied within 15 days after delivery to Landlord of (i) a true and complete statement reasonably detailing the identity of the proposed assignee, transferee or subtenant ("Transferee"), the nature of its business and its proposed use of the Premises, and (ii) any other information Landlord may reasonably request. Such consent shall not be unreasonably conditioned, withheld or delayed, provided that Landlord shall base its decision upon relevant factors which may include the following:

(i) in Landlord's reasonable judgment, the Transferee is engaged in a business or activity, and the Premises will be used in a manner, which is for the Permitted Use, and will not impose an excessive demand on or use of the facilities or services of the Building; and

(ii) Tenant shall, upon demand, reimburse Landlord for all reasonable expenses incurred by Landlord in connection with such assignment or sublease, including any investigations as to the acceptability of the Transferee and all legal costs reasonably incurred in connection with the granting of any requested consent not in excess of $2,500.00.

D. With respect to each and every subletting, transfer and/or assignment approved by Landlord under the provisions of this Lease:

(i) the form of the proposed assignment, transfer agreement or sublease shall (1) provide that it is expressly subordinate to this Lease, (2) include a confession of judgment clause for possession after a monetary event of default in form comparable to Article 20.D. of this Lease, and (3) require a sublessee, at Landlord's election, to attorn to Landlord if Landlord elects to preserve the sublease following a termination of Tenant's rights under this Lease as a direct lease between Landlord and the sublessee;

(ii) no sublease shall be for a term ending later than one day prior to the Expiration Date;

(iii) no Transferee shall take possession of any part of the Premises, until an executed counterpart of such sublease, transfer agreement or assignment has been delivered to Landlord; and

(iv) each sublease shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate; and Tenant and each Transferee shall be deemed to have agreed that upon the occurrence and during the continuation of an Event of Default hereunder, Tenant has hereby assigned to Landlord, and Landlord may, at its option, accept such assignment of, all right, title and interest of Tenant as sublandlord under such sublease, together with all modifications, extensions and renewals thereof then in effect and such Transferee shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be (A) liable for any previous act or omission of Tenant under such sublease, (B) subject to any counterclaim, offset or defense not

expressly provided in such sublease, which theretofore accrued to such Transferee against Tenant, (C) bound by any previous modification of such sublease not consented to by Landlord or by any prepayment of more than one month's rent, (D) bound to return such Transferee's security deposit, if any, except to the extent Landlord shall receive actual possession of such deposit and such Transferee shall be entitled to the return of all or any portion of such deposit under the terms of its sublease, or (E) obligated to make any payment to or on behalf of such Transferee, or to perform any work in the subleased space or the Building, or in any way to prepare the sublet space for occupancy, beyond Landlord's obligations under this Lease. The provisions of this Article 17(D)(v) shall be self-operative, and no further instrument shall be required to give effect to this provision, provided that the Transferee shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such subordination and attornment.

E. Notwithstanding the foregoing, and for the avoidance of doubt, Landlord's consent shall not be required with respect to (a) any assignment of this Lease or sublease or all of any part of the Demised Premises to a direct or indirect Affiliate of Tenant, (b) a merger, acquisition, reorganization or consolidation involving Tenant or any direct or indirect parent or Affiliate of Tenant regardless of whether Tenant or such parent or Affiliate is the surviving entity, (c) any assignment of this Lease in connection with the sale of all or substantially all of the assets of Tenant, or (d) a Change of Control; provided in each case (other than a Change of Control involving any direct or indirect parent of Tenant) that the transferee shall have a creditworthiness sufficient, in the reasonable judgment of Landlord, to perform the obligations of Tenant under this Lease, provided, however, the form of the proposed assignment shall be reasonably satisfactory to Landlord, and Tenant shall provide notice of any event described in (a) through (d) to Landlord. Such transferee's creditworthiness shall be deemed sufficient if the net worth of the transferee at or about the time of the transfer is equal to or better than that of Tenant, either as of the date hereof or the date of the transfer. In the event of a transfer of the Lease as provided in this subsection E., Tenant shall not be released from its obligations under this Lease following such transfer, unless the successor to Tenant has unencumbered liquid assets of not less than $5,000,000.00 as reflected in audited financial statements accompanied by an unqualified opinion by an independent certified public accountant approved by Landlord, which approval shall not be unreasonably withheld, or such other evidence of such liquidity acceptable to Landlord in the exercise of its reasonable judgment.

F. For purposes hereof, the term "Change of Control" shall mean the sale, transfer, assignment, pledge, encumbrance or hypothecation, directly or indirectly, of (i) the stock, partnership interests, limited liability company interests or other equity interests in Tenant or any direct or indirect parent of Tenant or (ii) any controlling interest in Tenant or any direct or indirect parent of Tenant. As used in this Article, the term "Affiliate" shall refer to a corporation or other entity which controls, is controlled by or is under common control with Tenant, by means of an ownership of either (a) more than fifty percent (50%) of the outstanding voting shares of stock or partnership or other ownership interests, or (b) stock, or partnership or other ownership interests, which provide the right to control the operations, transactions and activities of the applicable entity.

G. No transfer (in the case of an assignee) shall release Tenant from its obligations under the Lease, unless the assignee is an entity meeting the test of creditworthiness in subsection F. above, as reflected in audited financial statements (which includes an unqualified certification by a licensed certified public accountant reasonably acceptable to Landlord), or reviewed financial statements prepared by a licensed certified public accountant reasonably acceptable to Landlord.

## ARTICLE 18
## ACCESS TO DEMISED PREMISES

Upon reasonable prior written notice, but in no event less than twenty-four (24) hours (except in the case of an emergency), Landlord may enter the Demised Premises during Tenant's business hours for purposes of inspection or to show the Demised Premises to prospective purchasers during the last 180 days of the Term and to lenders or to perform maintenance and repair obligations imposed upon Landlord by this Lease. Landlord shall not unreasonably interfere with the business of Tenant or the Practice by such entry.

## ARTICLE 19
## DEFAULTS OF TENANT

A. The occurrence of any of the following shall constitute an "Event of Default":

(i) Any failure by Tenant to pay Rent or make any other payment required to be made by Tenant hereunder within ten (10) days after receipt of written notice from the Landlord;

(ii) A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by the Tenant where such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant, except that this thirty (30) day period shall be extended for a reasonable period of time if the alleged default is not reasonably capable of cure within said thirty (30) day period and Tenant proceeds to diligently cure the default;

(iii) Tenant shall make an assignment for the benefit of creditors or a trustee or receiver shall be appointed for all or substantially all of the assets of Tenant and such appointment is not dismissed or terminated within sixty (60) days; or

(iv) Tenant shall file a petition in bankruptcy under the laws of the United States or such petition shall be filed against Tenant and Tenant fails to vacate or set aside same within sixty (60) days after same is filed.

B. If an Event of Default has occurred and is continuing beyond the applicable cure period, then Landlord shall be entitled to take any of the following actions:

(i) To accelerate the whole or any part of the minimum rent and additional rent (sometimes collectively referred to in this Article 19 as "rent") and other charges, payments, costs and expenses herein agreed to be paid by Tenant for the ensuing one (1) year period, and any rent, other charges, payments, costs and expenses if so accelerated, in addition to any and all installments of rent already due and payable and in arrears, and any other charge, expense or cost herein agreed to be paid by Tenant, shall be due and payable and in arrears as if by the terms of this Lease such were on that date payable in advance; and if such Event of Default has not been cured within such one (1) year period, and the Lease not theretofore terminated and possession returned to Landlord, to repeat such acceleration for successive one (1) year periods at the expiration of the previous one (1) year period until the Event of Default is cured or the Lease terminated and possession returned to Landlord;

(ii) To terminate this Lease and the term hereby created without any right on the part of Tenant to waive the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken. No such termination of this Lease shall be deemed an election by Landlord to release Tenant from liability under this Lease, unless written notice of such release shall have been given to Tenant. In the event Landlord elects to terminate this Lease and Tenant's liability hereunder, Landlord shall be entitled to recover, in addition to any and all sums and damages for violation of Tenant's obligations hereunder in existence at the time of such termination, damages for Tenant's default in an amount equal to the amount of the rent reserved for the balance of the term of this Lease, as well as all other charges, payments, costs and expenses herein agreed to be paid by Tenant, all discounted at the rate of four percent (4%) per annum to their then present worth, less the fair rental value of the Demised Premises for the remainder of said term, also discounted at the rate of four percent (4%) annum to its then present worth, all of which amount shall be immediately due and payable from Tenant to Landlord.

C. **UPON AN EVENT OF DEFAULT HEREUNDER IN THE PAYMENT OF ANY RENT DUE HEREUNDER, THE DELINQUENT AMOUNT OF WHICH IS IN EXCESS OF SEVENTY THOUSAND DOLLARS ($70,000.00) FOR A PERIOD IN EXCESS OF SIXTY (60) DAYS, OR THE EXPIRATION OF THE TERM OF THIS LEASE OR A VIOLATION BY TENANT OF THE PROVISIONS OF ARTICLE 17 (ASSIGNMENT AND SUBLETTING), UPON THE LANDLORD'S ISSUANCE OF WRITTEN NOTICE TO TENANT OF SUCH EVENT OF DEFAULT AND ITS INTENTION TO EXERCISE THE REMEDY OF CONFESSION OF JUDGMENT AND THE EXPIRATION OF THIRTY (30) DAYS FOLLOWING DELIVERY OF SUCH NOTICE, TENANT HEREBY AUTHORIZES AND EMPOWERS ANY PROTHONOTARY OR ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE DEMISED PREMISES, AND CONFESSION OF JUDGMENT IN EJECTMENT FOR WHICH THIS LEASE SHALL BE HIS SUFFICIENT WARRANT; THEREUPON, IF LANDLORD SO DESIRES, AN APPROPRIATE WRIT OF POSSESSION MAY ISSUE FORTHWITH, WITHOUT ANY**

**PRIOR WRIT OR PROCEEDING WHATSOEVER, AND PROVIDED THAT IF FOR ANY REASON AFTER SUCH ACTION SHALL HAVE BEEN COMMENCED IT SHALL BE DETERMINED AND POSSESSION OF THE DEMISED PREMISES REMAIN IN OR BE RESTORED TO TENANT, LANDLORD SHALL HAVE THE RIGHT FOR THE SAME DEFAULT AND UPON ANY SUBSEQUENT DEFAULT OR DEFAULTS OR UPON THE TERMINATION OF THIS LEASE OR TENANT'S RIGHT OF POSSESSION AS HEREINBEFORE SET FORTH, TO CONFESS ONE OR MORE JUDGMENTS IN EJECTMENT AS HEREINBEFORE SET FORTH TO RECOVER POSSESSION OF THE DEMISED PREMISES. SUCH AUTHORITY SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, AND SUCH AUTHORITY MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE TERM OF THIS LEASE. FOR THE AVOIDANCE OF DOUBT, THE THRESHOLD AMOUNT AND WAITING PERIOD DESCRIBED IN THIS ARTICLE 19(C) APPLY SOLELY TO THE UTILIZATION OF THE WARRANT OF ATTORNEY TO CONFESS JUDGMENT FOR POSSESSION AND NOT TO A SUMMARY PROCEEDING OR NON-CONFESSION CIVIL ACTION.**

**D. NOTWITHSTANDING THE CONFESSION OF JUDGMENT PARAGRAPHS DESCRIBED IN THE WARRANT OF AUTHORITIES TO CONFESS JUDGMENT, IF THIS LEASE AGREEMENT INCLUDES ANY PROVISION WHICH IS DEEMED TO BE A POWER OF ATTORNEY SUBJECT TO SECTION 5601.3 OF CHAPTER 56 OF THE PENNSYLVANIA PROBATE ESTATES AND FIDUCIARY CODE (A "POA PROVISION") EACH POA PROVISION IS HEREBY MODIFIED TO INCLUDE AN IRREVOCABLE WAIVER BY EACH PRINCIPAL, OF THE AGENT'S DUTIES SET FORTH IN SECTION 5601.3(b) OF SAID CHAPTER, EACH OF UNDERSIGNED PARTIES HEREBY ACKNOWLEDGING THAT IN VIEW OF THE COMMERCIAL NATURE OF THE RELATIONSHIP BETWEEN THE PARTIES HERETO THERE IS NO EXPECTATION THAT THE AGENT SHALL HAVE A DUTY UNDER ANY POA PROVISION TO ACT IN THE BEST INTEREST OF ANY PRINCIPAL THEREUNDER, AND IT IS AGREED THAT THE AGENT SHALL HAVE NO SUCH DUTY.**

E. In any confessed judgment of ejectment and or for rent and/or other sums brought hereon, Landlord shall first cause to be filed in such action an affidavit made by Landlord or someone acting for Landlord, setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be prima facie evidence, and if a true copy of this Lease shall be filed in such suit, action or actions, it shall not be necessary to file the original as a warrant of attorney, any rule of Court, custom or practice to the contrary notwithstanding.

F. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any

remedy allowed at law or in equity as if reentry, summary proceedings and other remedies were not herein provided for.

G. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy herein or by law provided but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

H. Tenant expressly waives, if the Demised Premises are located in Pennsylvania, all rights under the Landlord and Tenant Act of 1951, and all supplements and amendments thereto, Tenant hereby authorizing the sale of any goods levied for rent at any time after ten (10) days from said levy without any appraisement and condemnation thereof, and the right to three (3) months and/or fifteen (15) or thirty days' notice required under certain circumstances by the Landlord and Tenant Act of 1951, Tenant hereby agreeing that ten (10) days' notice shall be sufficient in either or any such case.

I. For the purpose of calculating the rent reserved for sequential 1 year periods of this Lease for the purposes of subsection B of this Section, the amount payable as Real Estate Taxes, insurance and operating expenses for such sequential 1 year periods shall be equal to the sum of the highest amount paid or payable by Tenant in any calendar year for each of the foregoing items multiplied by the number of calendar years (including any fractional calendar year) remaining in the term of this Lease.

J. Tenant agrees to pay in addition any other sums reserved herein all sums which may become due by the failure of Tenant to comply with all the covenants of this Lease and any or all damages, cost and expenses which the Landlord may suffer or incur by reason of any default of the Tenant or failure on its part to comply with the covenants of this Lease and also any and all damages to the Demised Premises caused by any act or neglect by the Tenant. In addition to the provisions of the immediately preceding sentence, if Tenant fails to purchase and maintain the insurances required by Tenant to be maintain under this Lease, Landlord may, if it chooses (but shall have no obligation on its part to do so) advance sums on Tenant's behalf for such purpose and solely for the protection of Landlord's interest. Any such advance for insurance made by Landlord on Tenant's behalf will not excuse Tenant for its failure to comply with the terms of this Lease, the amount advanced shall be invoiced to Tenant as additional rent hereunder and interest shall accrue, until paid, at the Default Rate.

K. In addition to the forgoing, upon the occurrence of an Event of Default Landlord shall be entitled to collect from Tenant:

(1) the unamortized balances of (a) Landlord's Initial Contribution described in Article 6A hereof and (b) the commission paid by Landlord to Colliers International both unamortized balances to be based on a 120-month amortization term commencing on the Rent Commencement Date, utilizing a fixed interest rate equal to 200 basis points above the yield to

maturity on 10 year US Treasury obligations priced as of the date of the Event of Default, having a maturity date closest in time to the originally scheduled expiration date of the Primary Lease Term or Renewal Term, as applicable; and

(2) the unamortized balances of the Landlord's Renewal Contributions described in Article 6B hereof (if the renewal terms are exercised) each to be amortized over the applicable Renewal Term, utilizing an interest rate calculated in the manner described in clause (1) above.

## ARTICLE 19A
## DEFAULTS OF LANDLORD

**A.** If Landlord shall fail to perform any of its obligations when and as due under this Lease and such failure shall continue for a period of more than thirty (30) days after written notice thereof from Tenant (or as to any matter that cannot reasonably be cured within such thirty (30) day period, then Landlord shall not be in default if Landlord commences such cure within the thirty (30) day period and thereafter diligently prosecutes such cure until completion) (a "Landlord Event of Default"), then Tenant may at its option exercise its remedies in accordance with Article 19B.

B. Tenant's remedies for breach or default by Landlord shall include the rights to: (1) perform the obligation of Landlord specified in such notice and incur any reasonable expense necessary to do so; and/or set off any amount owed to Tenant or any amount expended by Tenant against the next payments of Base Rent or other charges coming due under this Lease until recovered in full.

## ARTICLE 20
## SURRENDER OF DEMISED PREMISES

A. Any alterations to the Demised Premises made by or on the behalf of Tenant shall remain upon the Demised Premises at the expiration or earlier termination of this Lease and shall become the property of Landlord, provided, however, that as a condition to Tenant's right to leave such alterations in place, Tenant shall notify Landlord prior to the installation of such alterations and receive the approval of such leaving in place at the time of notice and prior to such installation. The foregoing shall not apply to the Tenant's Work approved by Landlord pursuant to the provisions of Article 6.B. above.

B. Any personal property of Tenant which shall remain in the Demised Premises or any part thereof after the expiration or earlier termination of this Lease shall be deemed to have been abandoned and either may be retained by Landlord as Landlord's property or may be disposed of in such manner as Landlord may see fit, provided that notwithstanding the foregoing Tenant shall, upon request of Landlord made no later than ten (10) days after expiration or earlier termination of this Lease, promptly remove from the Demised Premises

any personal property containing Hazardous Material or medical waste requiring special handling for disposal at Tenant's own cost and expense. If Tenant fails to remove any such property in accordance with this Article 20.B, Landlord may elect to do so, and the reasonable cost and expense thereof shall be paid by Tenant to Landlord as Additional Rent. If such personal property or any part thereof shall be sold by Landlord, Landlord may receive and retain the proceeds of such sale(s) as Landlord's property. The covenants contained in this Article 20.B shall survive the expiration or earlier termination of this Lease.

C. If the Demised Premises are not surrendered upon the expiration or sooner termination of this Lease, such holding over shall not be deemed to extend the Term or renew this Lease or to have created or be construed as a tenancy and Landlord shall be entitled to evict or dispossess Tenant without the necessity of further notice. However, Tenant shall pay, until such time as Tenant complies with this Article 20.C, in monthly installments in advance, on the first day of each and every month for the first two (2) months of such holding over, one hundred twenty five percent (125%) of the monthly installment of Base Rent payable during the last month of the Term and following such first two (2) months of holding over, one hundred fifty percent (150%) of such monthly installment of Base Rent.

## ARTICLE 21
## EMINENT DOMAIN

A. In the event of exercise of the power of eminent domain whereby (i) access to the Demised Premises is permanently impaired thereby and reasonable alternate access acceptable to Tenant is not provided by Landlord within thirty (30) days, or (ii) all or substantially all of the Demised Premises is taken, or (iii) less than substantially all of the Demised Premises is taken but Tenant, acting in good faith, determines that because of such taking it is economically unfeasible to continue to conduct its business in the uncondemned portion of the Demised Premises, then either party, in the case of (i) or (ii), and Tenant, in the case of (iii), shall have the right to terminate this Lease as of the date when possession of that part which was taken is required to be delivered and surrendered to the condemning authority; and in such case all Base Rent and other charges shall be adjusted to the date of termination. For the avoidance of doubt, a taking shall include the transfer of title or any interest in the Demised Premises by deed or other instrument of law incident to condemnation proceedings.

B. Notwithstanding anything hereinabove provided, in the event of a taking only of the right to possession of the Demised Premises for a fixed period of time or for the duration of an emergency or other temporary condition in either event not in excess of thirty (30) days, then this Lease shall continue in full force and effect with an abatement of Rent for the period until Tenant's possession is restored.

C. Tenant shall have no right to participate or share in any condemnation claim, damage award or settlement in lieu thereof with respect to any taking of any nature; provided, however, that (1) Tenant shall not be precluded from claiming or receiving payment for

Tenant's relocation and moving expenses and loss of use or its personal property as may be permitted under applicable law.

**ARTICLE 22**
**ATTORNEYS' FEES**

In the event that at any time during the Term of this Lease either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable attorneys' fees and paralegal fees and other reasonable expenses incurred therein by the successful party, including all such legal fees and other expenses incurred prior to trial, at trial and at all levels of appeal and post-judgment proceedings.

**ARTICLE 23**
**NOTICES**

Notices and demands required or permitted to be sent to those listed hereunder shall be sent by certified mail, return receipt requested, postage prepaid, or by Federal Express or other reputable overnight courier service and shall be deemed to have been sent on the date the same is postmarked if sent by certified mail or the day deposited with Federal Express or such other reputable overnight courier service, but shall not be deemed received until two (2) business days following deposit with Federal Express or other reputable overnight courier service or three (3) business days following deposit in the United States Mail if sent by certified mail. All notices shall be addressed as follows:

**TO LANDLORD:**
281 Montgomery Avenue
Bala Cynwyd, PA 19004

With copy to:
Anthony J. Beldecos Esquire
Lundy Beldecos & Milby PC
450 N Narberth Ave
Suite 200
Narberth PA 19072
abeldecos@LBMlaw.com

**TO TENANT:**

Shouldice Hospital Limited

7750 Bayview Avenue
Thornhill ON L3T 4A3
Canada
Attn: Managing Director
jhughes@shouldice.com

With a copy to:
Edward J. Hollin, Esquire
717 Constitution Drive
Exton, PA 19341
edh@rrhc.com

or at such other address requested in writing by either party upon thirty (30) days' notice to the other party.

**ARTICLE 24**
**REMEDIES**

All rights and remedies of Landlord and Tenant herein created or otherwise extending at law are cumulative, and the exercise of one or more rights or remedies may be exercised and enforced concurrently or consecutively and whenever and as often as deemed desirable.

**ARTICLE 25**
**SUCCESSORS AND ASSIGNS**

Without prejudice to the provisions of Article 17, all covenants, promises, conditions, representations and agreements herein contained shall be binding upon, apply and inure to the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**ARTICLE 26**
**WAIVER**

The failure of either Landlord or Tenant to insist upon strict performance by the other of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any subsequent breach or default in any of the covenants, conditions and agreements of this Lease. No surrender of the Demised Premises by Tenant shall be effected by Landlord's acceptance of keys or by other means whatsoever unless the same is evidenced by Landlord's written acceptance of the surrender.

## ARTICLE 27
## INTERPRETATION

The parties hereto agree that it is their intention hereby to create only the relationship of Landlord and Tenant. No provision hereof, or act of either party hereunder, shall ever be construed as creating the relationship of principal and agent, or a partnership, or a joint venture or enterprise between the parties hereto.

## ARTICLE 28
## COVENANT OF TITLE AND QUIET ENJOYMENT

Landlord covenants that it has full right, power and authority to make and execute this Lease, subject only to matters of record affecting title, Tenant or any permitted assignee or sublessee of Tenant, upon the payment of the Rent and performance of the covenants hereunder, shall and may peaceably and quietly have, hold and enjoy the Demised Premises and improvements thereon during the Term or any renewal or extension thereof.

## ARTICLE 29
## ESTOPPEL

At any time and from time to time either party, upon written request of the other party, will execute, acknowledge and deliver an instrument, stating, if the same be true, that this Lease, a copy of which will be attached to the instrument, is a true and exact copy of the Lease between the parties hereto, that there are no amendments hereof (or stating what amendments there may be), that the Lease is then in full force and effect and that, to the best of its knowledge, there are no offsets, defenses or counterclaims with respect to the payment of Rent reserved hereunder or in the performance of the other terms, covenants and conditions hereof on the part of Tenant or Landlord, as the case may be, to be performed, and that as of such date no default has been declared hereunder by either party or, if facts constituting a default are known, specifying the same. Such instrument will be executed by the other party and delivered to the requesting party within fifteen (15) business days of receipt. If the estoppel instrument is not executed and delivered within fifteen (15) business days, the statements made in the estoppel request shall be deemed to be correct.

## ARTICLE 30
## RECORDING

Neither Landlord nor Tenant shall record this Lease. At the request of either Landlord or Tenant, the parties shall join in the execution of a memorandum or so-called "short-form" of this Lease for the purposes of recordation. Any recording costs associated with the memorandum or short form of this Lease shall be borne by the party requesting recordation.

## ARTICLE 31
## FORCE MAJEURE

In the event that either party hereto shall be delayed or hindered in or prevented from the performance required hereunder by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war, acts of God, regional epidemic or pandemic, government ordered closure or moratorium, or other reasons of like nature not the fault of the party delayed in performing work or doing acts (hereinafter, a "Permitted Delay" or "Permitted Delays"), such party shall be excused from performance for the period of time equivalent to the delay caused by such Permitted Delay. Notwithstanding the foregoing, any extension of time for a Permitted Delay shall be conditioned upon the party seeking an extension of time delivering written notice of such Permitted Delay to the other party within ten (10) days of the event causing the Permitted Delay. The maximum period of time either party may delay any act or performance of work due to a Permitted Delay shall be sixty (60) days, except in the event of government declared emergency a) precluding Tenant from having access to its funds or bank accounts; b) restricting or precluding Tenant and Tenant's patients, employees and suppliers from travel to the Premises or gaining access to the Premises or delivering equipment and supplies essential to the performance of Tenant's business; or c) preventing Tenant's workforce from performing the work to be performed at the Premises (each a "Rent Abatement Emergency"). Except in the event of a Rent Abatement Emergency, this Article 31 shall not excuse timely payment of Rent. Tenant's obligation to pay Base Rent (but not Additional Rent) shall be abated for the duration of a Rent Abatement Emergency. Any abatement of Base Rent pursuant to the provisions of this Article 31 shall be paid to Landlord in twelve (12) equal monthly installments beginning with the first day of each month after the Rent Abatement Emergency ends. If any such Rent Abatement Emergency is or will be, based on an announcement of duration by a governmental authority, in effect for six (6) consecutive months, then Tenant shall have the right to terminate this Lease upon written notice to Landlord, delivered not later than thirty (30) days following the end of such six (6) month period measured from the commencement of the Rent Abatement Emergency, effective sixty (60) days after the issuance of such notice, at which time the Premises shall be returned to Landlord in the condition required by Article 20 of this Lease, and thereafter the parties shall have no further obligations to the other pursuant to this Lease, except that Tenant shall be obligated to pay to Landlord the "Unforeseeable Event Termination Fee" as defined below and Tenant shall continue to pay Additional Rent until the date the Premises are returned to Landlord.

If at any time, by reason of governmental action (1) previously issued licenses or permits issued to Tenant or its Affiliate authorizing Tenant or its Affiliate to perform external abdominal wall hernia repair surgeries utilizing the Shouldice Methodology, as it may evolve over time ("Hernia Repair Services") at the Demised Premises are suspended or revoked, which suspension or revocation is not caused by any misconduct or non-compliance by Tenant or its Affiliate with governmental regulations in effect prior to such suspension or revocation, or (2) the ability of individuals or employers to provide or obtain health insurance as an alternative to government-provided health insurance to reimburse patients for Hernia Repair Services

provided by Tenant or its Affiliate at the Demised Premises is terminated, as a result of either of which events described in clauses (1) and (2) above, Tenant or its Affiliate is precluded from providing Hernia Repair Services at the Demised Premises or (3) Tenant's or its Affiliate's patients are precluded from obtaining reimbursement for the cost of such Hernia Repair Services at the Demised Premises because private health insurance is no longer legally available, or (4) either Tenant or its Affiliate is precluded from ownership of a business which provides Hernia Repair Services at the Demised Premises, or (5) Tenant or its Affiliate is precluded from providing Hernia Repair Services or receiving at least 80% of its reasonable and customary payment or reimbursement for Hernia Repair Services at the Demised Premises for reasons which could not have reasonably been anticipated at the time of execution of this Lease, it being agreed that the occurrence of any of the events described in (1) through (5) above is one the non-occurrence of which was a basic assumption on which this Lease was made (each a "Fatal Event"), then in any such Fatal Event, Tenant shall have the right to terminate this Lease by written notice to Landlord delivered not later than thirty (30) days following the occurrence of such Fatal Event, effective sixty (60) days after the issuance of such notice, at which time the Premises shall be returned to Landlord in the condition required by Article 20 of this Lease, and thereafter the parties shall have no further obligations to the other pursuant to this Lease, except that Tenant shall be obligated to pay to Landlord (i) all Base and Additional Rent accruing under this Lease until the date the Demised Premises is returned to Landlord in the condition required by Article 20 of this Lease, and (ii) the "Unforeseeable Event Termination Fee" as defined below.

For the purpose of this Article 31, the "Unforeseeable Event Termination Fee" shall mean a sum equal to (1) the greater of (A) $1,000,000.00 or (B) twelve (12) months of Base Rent calculated as of the date Tenant exercises its right to terminate the Lease pursuant to this Article 31 by reason of either a Rent Abatement Emergency or Fatal Event, plus (2) the Leasing Commission Payoff Amount calculated as of a date occurring one (1) year after the effective date of termination.

Upon the exercise by Tenant of its right to terminate this Lease following a Rent Abatement Emergency or Fatal Event, Tenant shall cooperate with providing Landlord reasonable access to the Demised Premises for the purpose of showing the Demised Premises to potential replacement tenants, in a manner so as to not interfere with Tenant's use of the Demised Premises and the safety and privacy of patients and medical service providers operating in the Demised Premises.

## ARTICLE 32
## CONSENT

Except as otherwise provided in this Lease, wherever in this Lease Landlord or Tenant is required to give its consent or approval, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

**ARTICLE 33**
**SEVERABILITY**

Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provisions hereof and such other provisions shall remain in full force and effect.

**ARTICLE 34**
**GOVERNING LAW AND VENUE**

This Lease shall be governed by the laws of the state in which the Demised Premises is located.

ARTICLE 35
**TENANT FINANCING**

A. Tenant shall have the right from time to time during the Term hereof and without Landlord's further approval, written or otherwise, to grant and assign to Tenant's lender or lenders a mortgage or other security interest in Tenant's interest in this Lease and in Tenant's Property (which may include, without limitation, the recording of a leasehold mortgage against the Demised Premises and any such mortgagee or pledgee may, without Landlord's consent, foreclose on or otherwise transfer their interest or title herein, or have Tenant transfers its interest or title herein in lieu of foreclosure or similar proceedings, to a successor mortgagee or pledgee or a third party purchaser). Landlord agrees to execute such amendments, confirmation, certificates and other documents as Tenant's lenders may reasonably request in connection with any such financing. Such documents may include, without limitation, the right for Tenant's lenders to enter the Demised Premises prior to or within a reasonable time after the termination of the Lease to remove or conduct a sale of Tenant's Property and to receive notice of and a right to cure any defaults of Tenant which Tenant fails to cure or a waiver of any contractual or statutory Landlord's lien on Tenant's property, and a waiver by Landlord of any Landlord's lien on Tenant's Property, in the customary form required by Tenant's lender.

B. Landlord shall reasonably cooperate with Tenant if Tenant desires to obtain a title insurance policy insuring Tenant's leasehold estate. Landlord agrees to execute all affidavits and instruments reasonably necessary for the issuance of the leasehold policy. Tenant shall bear the cost of the leasehold policy.

**ARTICLE 36**
**BROKERS**

Landlord and Tenant represent and warrant one to the other that they have not had any dealing with any real estate brokers or agents in connection with the negotiation of this Lease, except for Colliers International , the commission of which shall be paid by Landlord pursuant to a separate agreement. Landlord and Tenant indemnify, agree to defend, and hold each other harmless from and against any and all liability and cost which Landlord or Tenant may suffer in connection with any other real estate brokers claiming by, through or under the other party seeking any commission, fee or payment in connection with this Lease, including any cost of bonding or discharging any broker's lien which may be filed.

**ARTICLE 37**
**TIME OF THE ESSENCE**

Time shall be of the essence in interpreting the provisions of this Lease.

**ARTICLE 38**
**ENTIRE AGREEMENT**

This Lease contains all of the agreements of the parties hereto with respect to matters covered or mentioned in this Lease and no prior agreement, letters, representations, warranties, promises or understandings pertaining to any such matters shall be effective for any purpose. This Lease may be amended or added to only by an agreement in writing signed by the parties hereto or their respective successors or permitted assigns.

**ARTICLE 39**
**SECURITY DEPOSIT**

INTENTIONALLY OMITTED.

**ARTICLE 40**

**OPTION TO BUY DEMISED PREMISES**

A. Provided that at the time of exercise by Tenant of its option to purchase as described in this Section, there shall not be an uncured Event of Default relating to non-payment of rent, Tenant shall have an option to purchase ("Option") all of Landlord's right, title and fee simple interest in and the Demised Premises (the "Property") during the Primary Term. The Option is exclusive to Tenant and its Affiliates and may not be assigned or conveyed by Tenant to any third party, including without limitation any assignee or subtenant permitted under the terms of this Lease (except that Tenant may transfer the Option to an Affiliate). Tenant shall exercise the Option by giving written notice ("Option Notice") to the Landlord of its intent to purchase the Property, which must be received by Landlord no later than that day which is six months prior to the expiration of each Lease Year during the Primary Term as Tenant may elect to exercise such Option.

B. The purchase price for the Property (the "Option Purchase Price") shall be paid in immediately available funds at the closing, and shall be an amount equal to the following sums:

| | |
|---|---|
| During the 1st three (3) years of the Primary term- | $12,000,000.00 |
| During year 4 - | $12,333,000.00 |
| During year 5- | $12,666,000.00 |
| During year 6- | $13,000,000.00 |
| During year 7- | $13,250,000.00 |
| During year 8- | $13,500,000.00 |
| During year 9- | $13,750,000.00 |
| During year 10- | $14,000,000.00 |

C. The Landlord shall convey good, marketable and insurable title to the Property by good and sufficient Special Warranty Deed in fee simple absolute, on or before closing; said title to be free, clear, and unencumbered except existing restrictions and easements of record shown on Tenant's title commitment, to which restrictions and easements Tenant does not object. Landlord shall cause the removal of the standard objections in Schedule B of Tenant's title commitment and those other objections which may be removed by Landlord's unilateral action, including payment of real estate taxes and satisfaction from the sale proceeds of liens of record.

D. The Deed shall be delivered, and the purchase money shall be paid at a closing to be held no later than sixty (60) days after the Option Notice. For the avoidance of doubt, the closing must occur prior to end of the applicable Lease Year for the Option Purchase Price to be the sum applicable to such Lease Year.

E. The following shall be prorated between the Landlord and Tenant, as of date of closing, (a) Realty Transfer Taxes shall be paid equally, (b) Rent under this Lease, real estate taxes and lienable assessments shall be prorated.

F. Notwithstanding the Option, Landlord may sell and convey the Demised Premises to any third party without the prior written consent of Tenant, provided, however, any such agreement of sale shall include a provision that Tenant's Option shall remain binding upon the transferee, and such sale and conveyance shall be under and subject to Tenant's rights under this Lease, including Tenant's option to purchase.

**ARTICLE 41**

This Lease is contingent upon EBS Holdings, Ltd. executing the delivering to Landlord the Surety Agreement attached hereto as Exhibit "D".

[Signature Page Follows]

IN WITNESS WHEREOF, the parties to the said Lease have executed this instrument as of the 21st day of May, 2020

TENANT:

BYRNES LEASE CO. LLC

By: ______________

Name: DR. E.B. Shoulders

Title: President.

LANDLORD:

330 LANCASTER AVENUE LLP
a Pennsylvania limited liability partnership

By: ______________

Name: Joseph Wakim

Title: Managing Partner

EXHIBIT A

**Legal Description of Demised Premises**

ALL THAT CERTAIN tract of land with improvements erected thereon, known as 330 Lancaster Avenue (f/k/a and referred to in previous Deed as 330 Lincoln Highway), Situate in the Township of East Whiteland, County of Chester, and Commonwealth of Pennsylvania, bounded and described according to a Survey made by Chester Valley Engineers, Inc., dated 8/24/1960, as follows:

BEGINNING at an iron pin on the South side of Lincoln Highway the Northeast corner of land now of formerly of John G. Thomas, then Northeast 273.56 feet along the Southerly side of Lincoln Highway to a spike; thence along the aforesaid course and still along the Southerly side of the said Lincoln Highway 93.40 feet to a spike; thence South 17 degrees 45 minutes East, 338.90 feet along lands now or formerly of the Estate of Carl Ulruch, deceased, to a point in the Northwest side of the right of way line of the Pennsylvania Railroad (Trenton Branch); thence South 66 degrees 53 minutes West, 256.29 feet along the Northwesterly side of said right of way line of the Pennsylvania Railroad to a granite stone on line of land now or formerly of John G. Thomas, thence along lands now or formerly of John G. Thomas, North 34 degrees 47 minutes 10 seconds West, 381.53 feet to the point of beginning.

BEING Chester County Uniform Parcel Identifier Number 42-4-309.1

BEING known and referred to as 330 Lancaster Avenue, Frazer, PA

*Lincoln Highway now known and referred to as Lancaster Avenue for purposes of this description.

BEING the same premises which The Bryn Mawr Trust Company, its successors and assigns, in fee, by Deed dated June 23, 2011 and recorded June 24, 2011 in the Office for the Recording of Deeds, in and for the County of Chester, in Deed Book 8199 page 1521 granted and conveyed unto 330 Lancaster Avenue, LLP.

EXHIBIT "B"
LANDLORD'S WORK

1) Bring the Building (entrances, toilet facilities, elevators, etc.) into compliance with ADA and all applicable government regulations as of the Commencement Date.

2) Deliver a watertight, airtight building shell free of leaks, penetrations, as of the Commencement Date.

3) Deliver sidewalks without cracks, gaps or fissures and in compliance with the Americans With Disabilities Act, and driveways and parking areas with new paved surface and striping as of the Commencement Date.

4) Purchase and deliver, at Landlord's sole cost and expense to the Demised Premises, an Emergency Generator capable of operating the building up to a cost not in excess of $450,000. Tenant shall be responsible, at its sole cost and expense, to install the cabling, piping, routing, exhaust routing, feeders and conduits extending from such generator to the Building or other points of connection (collectively, the "Generator Equipment"). The Generator Equipment shall be placed in a mutually-agreeable location, enclosed by screening materials and curbed to contain fuel spills (only if the Generator Equipment uses liquid fuels). The location of the related electrical conduits and gas piping to the pad shall also be coordinated with Landlord. The area in which the Generator Equipment is located shall be subject to all of the provisions of this Lease. Tenant shall be responsible for obtaining all permits, variances and licenses required, if any, by all relevant governmental agencies (collectively, "Tenant's Generator Permits"), and shall upon request deliver copies thereof to Landlord. Landlord shall cooperate with Tenant in its efforts to obtain

Tenant's Generator Permits, and agrees to execute, acknowledge and deliver such documents reasonably acceptable to Landlord as may reasonably be required in connection with such efforts, all at no cost or expense to Landlord. The installation, repair, maintenance and operation of the Generator Equipment will be in accordance with all applicable laws and except as herein set forth, at Tenant's sole risk, cost and expense. The cost of any maintenance and repair thereof following the expiration of the manufacturer's warranty, if any, shall be the responsibility of Tenant. Upon the expiration or earlier termination of this Lease, Generator Equipment shall remain part of the Demises Premises and not be removed by Tenant.

For the avoidance of doubt, Landlord's Work shall relate only to the currently existing Building conditions and (except for the Generator Equipment) not to any upgrades to accommodate Tenant's use, the latter of which shall be part of Tenant Work. Except for Landlord's Work the Demised Premises is being delivered it Tenant in its "as is" condition".

The Generator Equipment shall be delivered to the Demised Premises by Landlord not later than 90-days prior to the Commencement Date, provided, however, in the event Tenant's general contractor requires the Generator to be delivered to the Demised Premises sooner, for trade coordination purposes, Landlord agrees to do so.

Except as otherwise expressly set forth herein, all hard and soft costs associated with Tenant's Work shall be the sole cost and expense of Tenant.

EXHIBIT C

**Construction Rules and Regulations**

1. Tenant and/or the general contractor will supply Landlord with a copy of all permits prior to the start of any work.

2. Tenant and/or the general contractor will post the building permit on a wall of the construction site while work is being performed.

3. The tenant shall provide, in writing, prior to commencement of the work, the names and emergency numbers of all subcontractors, the general contractor superintendent, general contractor's project manager and the construction manager, if other than RE Builders Inc..

4. No construction is to be started until proper drawings have been submitted and approved in writing by Landlord.

5. Landlord is to be contacted by Tenant when work is completed for inspection. All damage to building will be determined at that time.

6. Landlord must approve all roof top equipment and placement. All penetrations must be cut and flashed by the roof warranty holder of the existing roof system.

7. Before Landlord makes final payment to Tenant, five sets of as-built and O&M manuals as well as a CADD disc must be submitted to Landlord.

8. The general contractor shall maintain insurance coverage throughout the job of a type(s), in amounts and issued by an insurance company, reasonably satisfactory to Landlord. Prior to the commencement of work, a Certificate of Insurance must be submitted with the limits of coverage per the limits noted in the Lease with such parties being named as additional insureds as Landlord requires from time to time.

9. Fire extinguishers supplied by the general contractor must be on the job-site at all times during demolition and construction.

10. Contractors will remove their trash and debris daily or as often as necessary to maintain cleanliness in the building. Building trash containers are not to be used for construction debris.

11. All construction materials or debris must be stored within the project confines or in an approved lock-up.

12. Contractor is responsible to keep the construction area safe and in a workmanlike manner.

Machinery noise shall not interfere with the peaceful enjoyment of any tenant or their invitees to the Building. No smoking in the Building will be allowed at any time.

13. All air handlers, CAV boxes and VAV boxes need pre-filters (construction filters) installed over filter bank and may require periodic changes during the construction period until each floor is complete at which time a change out of filters is required. All units will be required to be cleaned thoroughly if the system is contaminated and this procedure is not maintained.

EXHIBIT D

SURETY AGREEMENT

**SURETY AGREEMENT**

1. In order to induce and in consideration of the execution and delivery by **330 LANCASTER AVENUE LLP** (hereinafter referred to as "Lessor") of a certain Lease Agreement of even date herewith by and between Lessor and **BYRNES LEASE CO. LLC,** a Delaware limited liability company (hereinafter referred to as "Lessee") for all that land and the improvements thereon, located at 330 Lancaster Avenue Malvern Pennsylvania (which lease is hereafter referred to as the "Lease Agreement" or "Lease"), as described in said Lease Agreement, for the term stated in said Lease Agreement, and all extensions and renewals thereof, the undersigned does hereby for itself, and its successors and assigns, become surety to Lessor, and Lessor's successors and assigns for the full, faithful and prompt performance by Lessee of all the terms, covenants, agreements and conditions to be fulfilled and performed by Lessee under and pursuant to the aforesaid Lease Agreement, and for the full, faithful and prompt payment of all sums of money (in US Dollars) which, by virtue of said Lease Agreement, shall at any time or times become due and owing by Lessee including, without limitation thereto, all monies specifically reserved as rent thereunder and all costs, expenses and damages (including reasonable attorneys and costs) which Lessor, or Lessor's successors or assigns may suffer or incur by reason of the occurrence of any Event of Default by Lessee under the Lease, including interest (at the Interest Rate) and Late Charges assessed pursuant to the terms of the Lease, subject, however, to the limitations as provided in Section 12 below. Any capitalized terms not otherwise defined in this Surety Agreement shall have the meanings as provided in the Lease.

2. The undersigned and its successors and assigns shall be liable immediately upon an Event of Default (as defined in the Lease) of Lessee to comply with any of its obligations as aforesaid, and shall continue to be liable until said obligations shall have been fully satisfied and performed, without any notice whatsoever to the undersigned of the default of Lessee or of the continuance of any such Event of Default. The undersigned hereby waives all requirements of law as to notice to the undersigned of the acceptance of this Agreement or intention to act in reliance thereon or of any violation of any of the terms, covenants, agreements or conditions of said Lease Agreement, and does hereby agree that indulgence or extensions of time for performance or forbearances may be allowed to Lessee from time to time and for any length of time, without notice to the undersigned and without relieving or discharging the undersigned, and the undersigned agrees promptly upon demand or suit following an Event of Default under the Lease, to perform and pay all obligations of Lessee as aforesaid, irrespective of how long a period has expired since the occurrence of an Event of Default and irrespective of any damage or prejudice which may have been caused to the undersigned by reason of any such forbearance, indulgence or extension of time for performance.

3. The undersigned's obligations under this Surety shall extend and apply with respect to the full and faithful performance and observance of all of the covenants, terms and conditions of the Lease, as existing, extended, renewed or modified including, but not limited to, where: (i) the Lease is renewed or its term extended for any period beyond the original termination date specified in the Lease, either pursuant to any option granted under the Lease or otherwise at any time; (ii) Lessee holds over beyond the term of the Lease or any extension or renewal thereof; (iii) the Lease is modified in any way; or (iv) the Lease is assigned or the Demised Premises subleased without Lessee being released.

4. The undersigned hereby unconditionally waives:

(a) notice of acceptance of this Surety by Lessor;

(b) Presentment for payment, notice of non-payment, demand, protest, notice of protest and notice of dishonor or default to any party including the undersigned, except that such waiver shall not affect the requirement for notices prior to the occurrence of an Event of Default as provided in the Lease;

(c) Demand for payment as a condition of liability under this Surety.

5. All of the remedies hereinbefore given to Lessor and all rights and remedies given to Lessor by law, shall be cumulative and concurrent. All of the rights, remedies, powers, privileges, releases and waivers herein provided shall inure to the benefit of Lessor, as well as Lessor's heirs, executors, administrators, successors and assigns. No termination of the said Lease Agreement or the taking or recovery of the premises, which in either case does not effect a release of Lessee's obligations under the Lease Agreement, shall deprive Lessor of any of its remedies or actions against the undersigned for sums due at the time, or which, under the terms of the said Lease Agreement and of this Surety Agreement, would in the future become due as if there had been no termination.

6. **THE UNDERSIGNED REPRESENTS AND WARRANTS TO LESSOR THAT THE UNDERSIGNED HAS READ AND FULLY UNDERSTANDS THE TERMS AND PROVISIONS OF THIS SURETY AGREEMENT, HAS HAD AN OPPORTUNITY TO REVIEW THIS SURETY AGREEMENT WITH LEGAL COUNSEL OF ITS CHOICE AND HAS EXECUTED THIS SURETY AGREEMENT BASED UPON SUCH PARTY'S OWN JUDGMENT AND ADVICE OF SUCH INDEPENDENT LEGAL COUNSEL.**

7. The undersigned acknowledge and agree that it is not a condition to the undersigned's liability hereunder for Lessor to first proceed against Lessee to collect the obligations due Lessor from Lessee. The undersigned agree not to assert any defense available

to Lessee regarding any proceeding relating to Lessee under any bankruptcy, insolvency or similar law or statute or any jurisdiction against Lessor with regard to the Lease.

8. This Agreement shall be legally binding upon the undersigned and his/her respective heirs, executors and administrators and shall inure to the benefit of Lessor and Lessor's heirs, executors, administrators, successors and assigns, each of whom shall have the same rights, remedies, powers and privileges provided to the parties hereto.

**9. THE UNDERSIGNED SURETY AND ITS RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS EACH KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS SURETY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**10. THE VALIDITY OF THIS SURETY, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS SURETY AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF CHESTER, COMMONWAELTH OF PENNSYLVANIA, THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA OR, AT THE SOLE OPTION OF LESSOR, IN ANY OTHER COURT IN WHICH LESSOR SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. THE UNDERSIGNED WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 10.**

11. The undersigned hereby represents and warrants to Lessor that, as at the date hereof and

during the term of this Surety:

(a) it is a corporation existing and governed by the laws of the Province of Ontario, Canada;

(b) it has the necessary corporate authority, power and capacity to:

(i) own its property and to carry on its business; and

(ii) enter into this Surety and to carry out the transactions herein contemplated

on the terms and conditions herein contained;

(c) it has taken all corporate action that is necessary or desirable to authorize its entry into

this Surety and its carrying out of the transactions that this Surety contemplates;

(d) this Surety has been duly executed and delivered by the undersigned and constitutes a

legal, valid and binding obligation of the undersigned enforceable in accordance with its terms (except to the extent limited by equitable principles and laws affecting creditors' rights generally);

(e) neither the execution and delivery of this Surety by the undersigned, nor compliance by

the Surety with the terms, conditions and provisions hereof, will conflict with or result in a breach of any of the terms, conditions or provisions of:

(i) its creation documents or by-laws;

(ii) any agreement, instrument or arrangement to which the Surety is now a party

or by which the Surety is, or may be, bound, or constitute a default thereunder, or result thereunder in the creation or imposition of any encumbrance of any nature whatsoever upon any of the properties or assets of the undersigned;

(iii) any judgment or order, writ, injunction or decree of any court; or

(iv) any applicable law or governmental regulation;

(f) to the best knowledge of the undersigned, after due inquiry, there are no actions, suits or

proceedings pending (nor to the best knowledge of the undersigned, after due inquiry, is there any pending investigation) against or involving the undersigned at law or in equity or before or by any federal, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before or by any arbitrator of any kind, which (so far as the Surety can foresee) could reasonably be expected to materially and adversely affect or impair the ability of the undersigned to perform its obligations under this Surety, and the undersigned is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court, arbitrator or federal, provincial, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which involves a reasonable possibility (so far as the Surety can foresee) of any material adverse change in the business, properties or financial condition of the undersigned, which could reasonably be expected to materially and adversely affect or impair the ability of the undersigned to perform its obligations under this Surety;

(g) no action of approval, authorization, consent or other order of, and no designation, filing, further registration, qualification or recording with, any governmental or public body or authority is legally required to authorize or is otherwise required in connection with or for the execution, delivery or performance by the undersigned of this Surety except as having already been obtained.

12. Notwithstanding any provision to the contrary as contained in this Surety Agreement, the maximum liability of Surety hereunder shall be limited to the sum of (1) the following amounts:

Until the end of the third Lease Year, $3,000,000.00.

From the end of the third Lease Year until the end of the fourth Lease Year $2,000,000.00.

After the end of the fourth Lease Year, $1,000,000.00.

The foregoing limitations shall be increased by the amount of any past due rent at the time demand is made by Lessor for performance by the undersigned of its obligations under this Agreement, without including in such amount of past due rent any acceleration of rent or calculation of damages for future rent as described in in Article 19.B. of the Lease, plus the Leasing Commission Payoff Amount calculated in accordance with Article 1.E.(v) of the Lease.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, the undersigned has executed this Surety Agreement this _______ day of May, 2020.

**EBS HOLDINGS LIMITED**

**________________________________** **BY:**

**(SEAL)**

**WITNESS**

# EXHIBIT "B"

# SURETY AGREEMENT

1. In order to induce and in consideration of the execution and delivery by **330 LANCASTER AVENUE LLP** (hereinafter referred to as "Lessor") of a certain Lease Agreement of even date herewith by and between Lessor and **BYRNES LEASE CO. LLC,** a Delaware limited liability company (hereinafter referred to as "Lessee") for all that land and the improvements thereon, located at 330 Lancaster Avenue Malvern Pennsylvania (which lease is hereafter referred to as the "Lease Agreement" or "Lease"), as described in said Lease Agreement, for the term stated in said Lease Agreement, and all extensions and renewals thereof, the undersigned does hereby for itself, and its successors and assigns, become surety to Lessor, and Lessor's successors and assigns for the full, faithful and prompt performance by Lessee of all the terms, covenants, agreements and conditions to be fulfilled and performed by Lessee under and pursuant to the aforesaid Lease Agreement, and for the full, faithful and prompt payment of all sums of money (in US Dollars) which, by virtue of said Lease Agreement, shall at any time or times become due and owing by Lessee including, without limitation thereto, all monies specifically reserved as rent thereunder and all costs, expenses and damages (including reasonable attorneys and costs) which Lessor, or Lessor's successors or assigns may suffer or incur by reason of the occurrence of any Event of Default by Lessee under the Lease, including interest (at the Interest Rate) and Late Charges assessed pursuant to the terms of the Lease, subject, however, to the limitations as provided in Section 12 below. Any capitalized terms not otherwise defined in this Surety Agreement shall have the meanings as provided in the Lease.

2. The undersigned and its successors and assigns shall be liable immediately upon an Event of Default (as defined in the Lease) of Lessee to comply with any of its obligations as aforesaid, and shall continue to be liable until said obligations shall have been fully satisfied and performed, without any notice whatsoever to the undersigned of the default of Lessee or of the continuance of any such Event of Default. The undersigned hereby waives all requirements of law as to notice to the undersigned of the acceptance of this Agreement or intention to act in reliance thereon or of any violation of any of the terms, covenants,

agreements or conditions of said Lease Agreement, and does hereby agree that indulgence or extensions of time for performance or forbearances may be allowed to Lessee from time to time and for any length of time, without notice to the undersigned and without relieving or discharging the undersigned, and the undersigned agrees promptly upon demand or suit following an Event of Default under the Lease, to perform and pay all obligations of Lessee as aforesaid, irrespective of how long a period has expired since the occurrence of an Event of Default and irrespective of any damage or prejudice which may have been caused to the undersigned by reason of any such forbearance, indulgence or extension of time for performance.

3. The undersigned's obligations under this Surety shall extend and apply with respect to the full and faithful performance and observance of all of the covenants, terms and conditions of the Lease, as existing, extended, renewed or modified including, but not limited to, where: (i) the Lease is renewed or its term extended for any period beyond the original termination date specified in the Lease, either pursuant to any option granted under the Lease or otherwise at any time; (ii) Lessee holds over beyond the term of the Lease or any extension or renewal thereof; (iii) the Lease is modified in any way; or (iv) the Lease is assigned or the Demised Premises subleased without Lessee being released.

4. The undersigned hereby unconditionally waives:

(a) notice of acceptance of this Surety by Lessor;

(b) Presentment for payment, notice of non-payment, demand, protest, notice of protest and notice of dishonor or default to any party including the undersigned, except that such waiver shall not affect the requirement for notices prior to the occurrence of an Event of Default as provided in the Lease;

(c) Demand for payment as a condition of liability under this Surety.

5. All of the remedies hereinbefore given to Lessor and all rights and remedies given to Lessor by law, shall be cumulative and concurrent. All of the rights, remedies, powers, privileges, releases and waivers herein provided shall inure to the benefit of Lessor, as well as Lessor's heirs, executors, administrators, successors and assigns. No termination of the said Lease Agreement or the taking or

recovery of the premises, which in either case does not effect a release of Lessee's obligations under the Lease Agreement, shall deprive Lessor of any of its remedies or actions against the undersigned for sums due at the time, or which, under the terms of the said Lease Agreement and of this Surety Agreement, would in the future become due as if there had been no termination.

6. **THE UNDERSIGNED REPRESENTS AND WARRANTS TO LESSOR THAT THE UNDERSIGNED HAS READ AND FULLY UNDERSTANDS THE TERMS AND PROVISIONS OF THIS SURETY AGREEMENT, HAS HAD AN OPPORTUNITY TO REVIEW THIS SURETY AGREEMENT WITH LEGAL COUNSEL OF ITS CHOICE AND HAS EXECUTED THIS SURETY AGREEMENT BASED UPON SUCH PARTY'S OWN JUDGMENT AND ADVICE OF SUCH INDEPENDENT LEGAL COUNSEL.**

7. The undersigned acknowledge and agree that it is not a condition to the undersigned's liability hereunder for Lessor to first proceed against Lessee to collect the obligations due Lessor from Lessee. The undersigned agree not to assert any defense available to Lessee regarding any proceeding relating to Lessee under any bankruptcy, insolvency or similar law or statute or any jurisdiction against Lessor with regard to the Lease.

8. This Agreement shall be legally binding upon the undersigned and his/her respective heirs, executors and administrators and shall inure to the benefit of Lessor and Lessor's heirs, executors, administrators, successors and assigns, each of whom shall have the same rights, remedies, powers and privileges provided to the parties hereto.

9. **THE UNDERSIGNED SURETY AND ITS RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS EACH KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS SURETY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

10. **THE VALIDITY OF THIS SURETY, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS SURETY AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF CHESTER, COMMONWAELTH OF PENNSYLVANIA, THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA OR, AT THE SOLE OPTION OF LESSOR, IN ANY OTHER COURT IN WHICH LESSOR SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH**

**HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. THE UNDERSIGNED WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 10.**

11. The undersigned hereby represents and warrants to Lessor that, as at the date hereof and during the term of this Surety:

(a) it is a corporation existing and governed by the laws of the Province of Ontario, Canada;

(b) it has the necessary corporate authority, power and capacity to:

(i) own its property and to carry on its business; and

(ii) enter into this Surety and to carry out the transactions herein contemplated on the terms and conditions herein contained;

(c) it has taken all corporate action that is necessary or desirable to authorize its entry into this Surety and its carrying out of the transactions that this Surety contemplates;

(d) this Surety has been duly executed and delivered by the undersigned and constitutes a legal, valid and binding obligation of the undersigned enforceable in accordance with its terms (except to the extent limited by equitable principles and laws affecting creditors' rights generally);

(e) neither the execution and delivery of this Surety by the undersigned, nor compliance by the Surety with the terms, conditions and provisions hereof, will conflict with or result in a breach of any of the terms, conditions or provisions of:

(i) its creation documents or by-laws;

(ii) any agreement, instrument or arrangement to which the Surety is now a party or by which the Surety is, or may be, bound, or constitute a default thereunder, or result thereunder in the creation or imposition of any encumbrance of any nature whatsoever upon any of the properties or assets of the undersigned;

(iii) any judgment or order, writ, injunction or decree of any court; or

(iv) any applicable law or governmental regulation;

(f) to the best knowledge of the undersigned, after due inquiry, there are no actions, suits or proceedings pending (nor to the best knowledge of the undersigned, after due inquiry, is there any pending investigation) against or involving the undersigned at law or in equity or before or by any federal, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before or by any arbitrator of any kind, which (so far as the Surety can foresee) could reasonably be expected to materially and adversely affect or impair the ability of the undersigned to perform its obligations under this Surety, and the undersigned is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court, arbitrator or federal, provincial, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which involves a reasonable possibility (so far as the Surety can foresee) of any material adverse change in the business, properties or financial condition of the undersigned, which could reasonably be expected to materially and adversely affect or impair the ability of the undersigned to perform its obligations under this Surety;

(g) no action of approval, authorization, consent or other order of, and no designation, filing, further registration, qualification or recording with, any governmental or public body or authority is legally required to authorize or is otherwise required in connection with or for the execution, delivery or performance by the undersigned of this Surety except as having already been obtained.

12. Notwithstanding any provision to the contrary as contained in this Surety Agreement, the maximum liability of Surety hereunder shall be limited to the sum of (1) the following amounts:

Until the end of the third Lease Year, $3,000,000.00.

From the end of the third Lease Year until the end of the fourth Lease Year $2,000,000.00.

After the end of the fourth Lease Year, $1,000,000.00.

The foregoing limitations shall be increased by the amount of any past due rent at the time demand is made by Lessor for performance by the undersigned of its obligations under this Agreement, without including in such amount of past due rent any acceleration of rent or calculation of damages for future rent as described

in in Article 19.B. of the Lease, plus the Leasing Commission Payoff Amount calculated in accordance with Article 1.E.(v) of the Lease.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, the undersigned has executed this Surety Agreement this 21st day of May, 2020.

**EBS HOLDINGS LIMITED**

**WITNESS**

**BY:** ______________________ **(SEAL)**

# EXHIBIT "C"

Ver 3.17.22

# LEASE AMENDMENT AGREEMENT

**THIS LEASE AMENDMENT AGREEMENT ("Amendment")** made the 1st day of April, 2022, by and between **330 LANCASTER AVENUE, LLP,** a Pennsylvania limited liability partnership (hereinafter called "Landlord"), **and BYRNES LEASE CO. LLC, a** Delaware limited liability company (hereinafter called "Tenant").

## WITNESSETH:

**WHEREAS**, Landlord and Tenant entered into a written Lease Agreement dated May 21, 2020 ("Lease") for land ("Land") and the improvements thereon situate (consisting of a building ("Original Building") containing approximately 24,000 rentable square feet) located at 330 Lancaster Avenue Malvern Pennsylvania as more particularly described therein ("Demised Premises"); and

**WHEREAS**, Tenant has requested that Landlord expand the Original Demised Premises by constructing a 3,300 square foot one story addition to the Original Demised Premises, the location of which is depicted on Exhibit "A" hereto ("Additional Space"), resulting in the Building containing approximately 27,300 square feet.

Unless otherwise stated, all capitalized terms herein shall have the meaning ascribed to them in the Lease.

**NOW THEREFORE**, the parties hereto, in consideration of the mutual covenants herein contained and intending to be legally bound, do hereby agree as follows:

**1. AMENDMENTS**

(a) From and after the Delivery Date all references in the Lease to "Building" shall mean the Original Building plus the Additional Space. The Lease Term with respect to the

Additional Space shall run concurrent with the term of the Lease prior to the date of this Amendment. The permitted use of the Additional Space shall be the same as the Demised Premises. The parties acknowledge that the entire Land and Building were leased to Tenant pursuant to the Lease and as such, the definition of Demised Premises is unchanged.

(b) The first sentence of Article 1A is hereby revised to replace the reference to "Tenant's Improvements" with "Tenant's Work".

(c) Commencing on the Rent Commencement Date, Tenant shall pay to Landlord Base Rent as set forth on Exhibit "B" hereto, which shall be paid monthly, in advance, on the first day of each month as provided in the Lease. All references in the Lease to Base Rent shall be deemed to refer to Base Rent as shown on Exhibit "B" hereto.

(d) The construction of the Additional Space shall be part of Tenant's Work.

(e) Article 1D is hereby revised to provide that in the event Tenant is unable to obtain the Approvals by December 31, 2022, either Tenant or Landlord may terminate the Lease by written notice to the other.

(f) Article 1 E (iv) is deleted and replaced with the following:

"(iv) Tenant shall have paid to Landlord, not later than sixty (60) days prior to the accelerated expiration date of the Primary Term as a result of issuance of the Termination Notice (the "Termination Fee Due Date"), a lease termination fee as follows:

(1) $3,750,000.00 fee if Tenant elects to terminate the Lease at the end of the third (3rd) year; or

(2) $1,250,000.00 fee if Tenant elects to terminate the Lease at the end of the fifth (5th) year."

(g) Article 6A A is revised to increase the estimated Tenant Work to

$6,000,000, inclusive of the Emergency Generator;

(h) Article 6A B is revised to increase the Landlord percentage to 83.33% of the total costs incurred by Tenant to construct Tenant's Work, which would be $5,000,000.00 based on an estimate of $6,000,000.00 ("Landlord's Initial Contribution"). All references in the Lease to Landlord's Initial Contribution shall be deemed to refer to Landlord's Initial Contribution as defined herein;

(i) Article 6A C is revised to have the Tenant pay 16.67% balance, which would be $1,000,000 of the estimate of $6,000,000.00 ("Tenant's Contribution") towards Tenant's Work. All references in the Lease to Tenant's Contribution shall be deemed to refer to Tenant's Contribution as defined herein;

(j) Article 6A F is hereby amended and restated in its entirety as follows:

> F. (1) Landlord shall advance Landlord's Initial Contribution in installments, such that for every $1,000,000.00 of the Landlord's Initial Contribution paid by Landlord, Tenant shall simultaneously contribute $200,000.00 of Tenant's Contribution when payment is required, until the total cost of Tenant's Work reaches $6,000,000.00 (whereupon Tenant shall have contributed $1,000,000.00); and (2) if the cost of Tenant's Work exceeds $6,000,000.00, any costs over $6,000,000.00 to be advanced simultaneously and pro-rata by Landlord and Tenant on a pro rata 5:1 basis (5 to Landlord and 1 to Tenant). In the event the contractor's estimate exceeds $7,000,000.00 either Tenant or Landlord may terminate this Lease by written notice to the other within the 15-day period following receipt of the contractor's estimate. For the avoidance of doubt, in the event the cost of Tenant's Work is less than $6,000,000.00, Landlord and Tenant shall share in the cost savings in the same 5:1 ratio. For example, if the total cost of Tenant's Work equals $5,700,000.00, Landlord shall advance $4,750,000.00 as Landlord's Initial Contribution (in $1,000,000.00 installments as provided herein) and Tenant $950,000.00 as Tenant's Contribution (in $200,000.00 installments as provided herein).

(k) Notwithstanding any provision of the Lease to the contrary, Tenant agrees

that RE Builders, Inc. ("REB") shall be the project's general contractor.

(l) Article 6B A is revised to increase Landlord's Renewal Contribution to $273,300.00. All references in the Lease to Landlord's Renewal Contribution shall be deemed to refer to Landlord's Renewal Contribution as defined herein;

(m) Article 40 B. is revised to provide the following revised Option Purchase Prices:

| | |
|---|---|
| "During the 1st three (3) years of the Primary term- | $13,750,000.00 |
| During year 4 - | $14,000,000.00 |
| During year 5- | $14,250.000.00 |
| During year 6- | $14,500,000.00 |
| During year 7- | $14,750,000.00 |
| During year 8- | $15,000,000.00 |
| During year 9- | $15,250,000.00 |
| During year 10- | $15,500,000.00" |

**4. <u>CONFESSION OF JUDGMENT</u>**

(a) **UPON AN EVENT OF DEFAULT UNDER THE LEASE IN THE PAYMENT OF ANY RENT DUE, THE DELINQUENT AMOUNT OF WHICH IS IN EXCESS OF SEVENTY THOUSAND DOLLARS ($70,000.00) FOR A PERIOD IN EXCESS OF SIXTY (60) DAYS, OR THE EXPIRATION OF THE TERM OF THIS LEASE OR A VIOLATION BY TENANT OF THE PROVISIONS OF ARTICLE 17 OF THE LEASE (ASSIGNMENT AND SUBLETTING), UPON THE LANDLORD'S ISSUANCE OF WRITTEN NOTICE TO TENANT OF SUCH EVENT OF DEFAULT AND ITS INTENTION TO EXERCISE THE REMEDY OF CONFESSION OF JUDGMENT AND THE EXPIRATION OF THIRTY (30) DAYS FOLLOWING DELIVERY OF SUCH NOTICE, TENANT HEREBY AUTHORIZES AND EMPOWERS ANY PROTHONOTARY OR ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE DEMISED PREMISES, AND CONFESSION OF JUDGMENT IN EJECTMENT FOR WHICH THIS LEASE SHALL BE HIS SUFFICIENT WARRANT; THEREUPON, IF LANDLORD SO DESIRES, AN APPROPRIATE WRIT OF POSSESSION MAY ISSUE**

**FORTHWITH, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER, AND PROVIDED THAT IF FOR ANY REASON AFTER SUCH ACTION SHALL HAVE BEEN COMMENCED IT SHALL BE DETERMINED AND POSSESSION OF THE DEMISED PREMISES REMAIN IN OR BE RESTORED TO TENANT, LANDLORD SHALL HAVE THE RIGHT FOR THE SAME DEFAULT AND UPON ANY SUBSEQUENT DEFAULT OR DEFAULTS OR UPON THE TERMINATION OF THIS LEASE OR TENANT'S RIGHT OF POSSESSION AS HEREINBEFORE SET FORTH, TO CONFESS ONE OR MORE JUDGMENTS IN EJECTMENT AS HEREINBEFORE SET FORTH TO RECOVER POSSESSION OF THE DEMISED PREMISES. SUCH AUTHORITY SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, AND SUCH AUTHORITY MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE TERM OF THIS LEASE. FOR THE AVOIDANCE OF DOUBT, THE THRESHOLD AMOUNT AND WAITING PERIOD DESCRIBED IN THIS ARTICLE 19(C) APPLY SOLELY TO THE UTILIZATION OF THE WARRANT OF ATTORNEY TO CONFESS JUDGMENT FOR POSSESSION AND NOT TO A SUMMARY PROCEEDING OR NON-CONFESSION CIVIL ACTION.**

(b) **NOTWITHSTANDING THE CONFESSION OF JUDGMENT PARAGRAPHS DESCRIBED IN THE WARRANT OF AUTHORITIES TO CONFESS JUDGMENT, IF THE LEASE AS HEREBY AMENDED INCLUDES ANY PROVISION WHICH IS DEEMED TO BE A POWER OF ATTORNEY SUBJECT TO SECTION 5601.3 OF CHAPTER 56 OF THE PENNSYLVANIA PROBATE ESTATES AND FIDUCIARY CODE (A "POA PROVISION") EACH POA PROVISION IS HEREBY MODIFIED TO INCLUDE AN IRREVOCABLE WAIVER BY EACH PRINCIPAL, OF THE AGENT'S DUTIES SET FORTH IN SECTION 5601.3(b) OF SAID CHAPTER, EACH OF UNDERSIGNED PARTIES HEREBY ACKNOWLEDGING THAT IN VIEW OF THE COMMERCIAL NATURE OF THE RELATIONSHIP BETWEEN THE PARTIES HERETO THERE IS NO EXPECTATION THAT THE AGENT SHALL HAVE A DUTY UNDER ANY POA PROVISION TO ACT IN THE BEST INTEREST OF ANY PRINCIPAL THEREUNDER, AND IT IS AGREED THAT THE AGENT SHALL HAVE NO SUCH DUTY.**

(c) In any confessed judgment of ejectment and or for rent and/or other sums brought hereon, Landlord shall first cause to be filed in such action an affidavit made by Landlord or someone acting for Landlord, setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be prima facie evidence, and if a true copy of this Lease shall be filed in such suit, action or actions, it shall not be necessary to file the original as a warrant of attorney, any rule of Court, custom or practice to the contrary notwithstanding.

5. **REPRESENTATIONS**

Tenant hereby represents and warrants to Landlord, such representation and warranty being a material inducement for Landlord's consent as above provided, that except as hereinafter provided:

(a) Tenant has no claim against Landlord whatsoever with respect to the Lease as of the date of this Amendment, that the Lease is in full force and effect, and neither Tenant nor Landlord is in default thereunder.

(b) Tenant has not filed and is not the subject of any filing for bankruptcy or reorganization under any Federal Bankruptcy Laws.

(c) This Amendment has been duly authorized, executed and delivered by Tenant and constitutes a legal, valid and binding agreement which is enforceable against Tenant in accordance with its terms.

6. **GOVERNING LAW**

This Amendment and the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the State wherein the Demised Premises is located, without giving effect to the choice of law principles thereof. Any suit brought hereon, whether in tort, contract, equity or otherwise, shall be brought in the state or federal courts sitting in said state, the parties hereto waiving any claim or defense that such forum is not convenient or proper

7. **ENTIRE AGREEMENT; AMENDMENTS**

The Lease and this Amendment (i) contain the entire agreement among the parties hereto with respect to the subject matter hereof, (ii) supersede all prior written agreements and negotiations and oral understandings, if any, with respect thereto, and (iii) may

not be amended or supplemented except by an instrument or counterparts thereof in writing signed by the parties.

8. **SUCCESSORS**

This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

9. **SEVERABILITY**

Any provision of this Amendment which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

10. **NO WAIVER**

It is hereby agreed, any law, usage or custom to the contrary notwithstanding, that Landlord shall have the right at all times to enforce the provisions of the Lease as hereby amended, in strict accordance with its terms, notwithstanding any conduct or custom on the part of the Landlord in refraining from doing so at any time or times, and further, that the failure of Landlord at any time to enforce its rights under said covenants strictly in accordance with the same shall not be construed as a waiver or as having created a custom in any way or manner contrary to the specific terms, provisions and covenants of the Lease. All remedies of Landlord contained in the Lease are incorporated herein by reference.

11. **RATIFICATION OF LEASE**

In all other respects, the Lease as amended, is hereby ratified and confirmed.

12. **CAPTIONS**

The captions of this Amendment are for convenience and reference only and do

not define, describe, extend or limit the scope or intent of this Amendment or any of its provisions.

**13. <u>COUNTERPART SIGNATURES</u>**

This Amendment and the acknowledgement and acceptance of the conditions hereof may be executed in counterparts, each of which shall be considered an original but constituting one and the same document.

**14. <u>AMENDMENT</u>**

This Amendment shall not be modified or amended except in a writing executed by all parties hereto. The submission of an unsigned copy of this Amendment to Tenant shall not constitute an offer or option to amend the Lease in accordance with the terms and conditions set forth above. This Amendment becomes effective and binding only upon execution by Landlord and Tenant.

[AMENDMENT SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, this Lease Amendment Agreement has been made, executed and delivered the day and year first above written.

TENANT:

BYRNES LEASE CO. LLC

By: ____________________
Name: John Hughes
Title: CEO

LANDLORD:

330 LANCASTER AVENUE LLP
a Pennsylvania limited liability partnership

By: ____________________
Name: Joseph Wakim
Title: Managing Partner

**IN WITNESS WHEREOF**, this Lease Amendment Agreement has been made, executed and delivered the day and year first above written.

TENANT:

BYRNES LEASE CO. LLC

By: ______________________
Name: John Hughes
Title: CEO

LANDLORD:

330 LANCASTER AVENUE LLP
a Pennsylvania limited liability partnership

By: ______________________
Name: Joseph Wakim
Title: Managing Partner

## SURETY RATIFICATION

The undersigned pursuant to Surety Agreement dated May 21, 2020, hereby acknowledges this Lease Amendment Agreement and agrees to continue to serve as Surety to Tenant's obligations under the Lease, as amended hereby, pursuant to the terms and conditions of the said Surety Agreement.

SURETY:
EBS HOLDINGS LIMITED

By: ______________________ APRIL 1st, 2022

Vice-President
EBS Holdings
I have authority to bind the Corporation

EXHIBIT A
SITE PLAN FOR ADDITIONAL SPACE – Highlighted in Yellow



EXHIBIT "B"
REVISED RENT SCHEDULE

| PRIMARY TERM | ANNUAL RENT | MONTHLY RENT |
|---|---|---|
| Month 1 through 122 | $1,010,100.00 | $84,175.00 |

| FIRST RENEWAL TERM | ANNUAL RENT | MONTHLY RENT |
|---|---|---|
| Years 11 to15 | $1,201,457.88 | $100,121.49 |

| SECOND RENEWAL TERM | ANNUAL RENT | MONTHLY RENT |
|---|---|---|
| Years 16 to 20 | $1,310,329.87 | $109,194.16 |

The Base Rent during each year of the Primary Term and Renewal Terms (if exercised) shall be increased by an amount equal to 1.75% of the Base Rent for the immediately preceding Lease Year. For the avoidance of doubt, such adjustments shall be applied to the Primary Term and each Renewal Term independently.

# EXHIBIT "D"

(717) 787-1911

November 28, 2022

John Hughes
Shouldice Hernia Hospital
7750 Bayview Avenue
Thornhill, ON, CN L3T4A3

File No.: ID #51000101-01

Plan Reviewer: Gary W. Stabler
Drawing Index: H-22-1235
Approval Date: 11/28/2022

**RE: Shouldice Hernia Hospital LLC**
**Alterations to convert an existing 2 story building into a new 24 bed specialty hospital that focuses on the surgical repair of abdominal wall hernias.**

Dear Mr. Hughes:

Plans for the subject project have been approved. This is a Type II (111) fully sprinklered building construction as per NFPA 220 and shall comply with the NFPA 101, "Life Safety Code," 2012 Edition, including Chapter 2 and all Hospital Licensure Regulations as adopted by the Pennsylvania Department of Health.

Revision is required to be submitted to document items noted on the Cover Sheet.

This project must also comply with the 2018 Edition of the "Guidelines for Design and Construction of Healthcare Facilities", Chapter 1.2-4, **Safety Risk Assessment (SRA)**. Adequate precautions must be taken to maintain a safe environment of care throughout the construction project. Sanctions may be imposed by regulatory authorities for failure to maintain a safe environment of care.

If changes were required on your plans to obtain the final plan approval, these changes are shown as red markings on the plans and must be incorporated in the construction before the project will receive final inspection and occupancy approval. If formal sprinkler drawings are required, or if partial occupancy approval is requested, no occupancy will be granted without those drawings being submitted and approval of plans for revisions or changes that affect the original approval. Sufficient lead-time should be allowed for approval of plans and scheduling of inspections.

The Division of Safety Inspection must be notified when construction has started and when construction has been completed. NOTIFY IN WRITING: Sheila Osborne, Safety Inspection Supervisor, Harrisburg Field Office, 2525 North 7th Street, Suite 210, Harrisburg, PA 17110

Failure to notify the Department of Health, Division of Safety Inspection, that the construction proposed by these plans is completed, and/or the use and occupancy of the property prior to the issuance of an Occupancy Approval or a construction survey acceptance letter by this Department, constitutes a violation of the Health Care Facilities Act, Act #48, P.L. 130 and licensure regulations. Violations are subject to penalties and prosecutions prescribed by law.

Sincerely,

Charles Schlegel, Director
Division of Safety Inspection

CS:GWS:dll
cc: Shouldice Hernia Hospital LLC
Division of Acute and Ambulatory Care
Harrisburg DSI Field Office
DSI Central File

pennsylvania
DEPARTMENT OF HEALTH

**DATE:** August 5, 2019

**SUBJECT:** Guidance for innovative hospital models

**ISSUE**

Identify the regulatory authority for the Department of Health (Department) to approve applicants' requests for hospital licensure and provide information regarding the application and licensing process for an innovative hospital model.

**BACKGROUND**

Several applicants for hospital licensure have approached the Department with innovative plans for facilities that offer fewer services than existing hospitals. An example of an innovative hospital model would be a full emergency department without 24/7 surgical services.

As the regulator, the Department is responsible for ensuring appropriate levels of patient safety, quality of care and patient access. While we are cognizant of our role as the regulator, the Department does not want to prevent innovative ways to provide patient care in a changing health care environment.

A facility applying to be licensed as a hospital must meet the statutory definition of a hospital, which includes "being established for the purpose of providing services to inpatients" and meeting all applicable regulatory requirements.

**APPLICATION PROCESS:**

The Department has concluded that innovative hospital models can be licensed under the current statutory and regulatory scheme. Facilities seeking licensure should use the following guidance when applying for licensure:

The facility must request an application from the Department, pursuant to 28 Pa. Code § 101.43. The facility shall complete the application and submit a plan review. In addition to all documentation currently required, the plan review for an innovative hospital model should include the following:

1. A description of the innovative model and how the innovation promotes efficient delivery of services in the area, increases quality of care delivered and increases access by patients; and
2. A statement that the facility will meet CMS guidelines and requirements and a description of how the specific guidelines will be met.

A facility with an innovative hospital model should review the below guidance on "Requirements for Licensure" when completing its application.

pennsylvania
DEPARTMENT OF HEALTH

**REQUIREMENTS FOR LICENSURE**

The Health Care Facilities Act (35 P.S. §448.801 – 448.904b) provides the Department with the authority to license health care facilities and to promulgate regulations necessary to carry out such licensure. A facility seeking licensure must show that it meets the Department's regulatory requirements to be issued a license. The Department has provided the below guidance relating to specific requirements under the Department's regulations that may be useful to applicants with an innovative hospital model.

- The Department requires the facility to meet the requirements of 28 Pa. Code § 101.31 with the noted guidance:
  - **§ 101.31. Hospital requirements:** A hospital shall have all of the following:
    (1) An organized governing body;
    (2) A chief executive officer;
    (3) An organized medical staff;
    (4) An organized nursing staff;
    (5) Medical services, continuous[1];
    (6) Nursing services, continuous;
    (7) Permanent on-site facilities for the care of patients 24 hours a day;
    (8) A hospital-wide infection control program;
    (9) Minimum on-site clinical provisions as follows:
      (i) Inpatient care areas equipped with hospital furnishings.
      (ii) Nursing care units.
      (iii) Diagnostic and treatment areas[2]

---

[1] A facility with an innovative hospital model will need to provide documentation evidencing its ability to provide continuous medical services. If the facility intends to satisfy this requirement through transfer agreements, it must include arrangements with all neighboring hospitals where a patient would foreseeably be sent for continuation of medical care which cannot be safely provided by the facility. The facility must also have a policy that specifically states that the facility will comply with all EMTALA requirements prior to the transfer of a patient. The Department reserves the right to reject an application if a facility is not able to secure an acceptable transfer agreement with all neighboring hospitals or if the Department determines that the distance and/or time of transfer is too great to be considered continuous care.

pennsylvania
DEPARTMENT OF HEALTH

(iv) Supplies and equipment to meet the medical and nursing needs of the patients within the scope of the services provided.
(v) Pharmaceutical services in compliance with Chapter 113 (relating to pharmacy services).
(vi) Facilities for the sterilization of equipment and supplies.
(vii) Treatment equipment for drug, blood, and parenteral fluid administration and for performance of medical or surgical nursing procedures.
(viii) Treatment equipment for the management of common medical or surgical, or both, emergencies, including facilities for cardio-pulmonary resuscitation[3].
(ix) Medical records services.
(x) Provision for medical social work services in compliance with Chapter 121 (relating to social work services).
(xi) Professional library services in compliance with Chapter 145 (relating to professional library services)[4].
(xii) Provision for therapeutic diets; and

(10) Minimum supportive capabilities or facilities as follows:

---

[2] A facility with a full emergency department without 24/7 surgical services must post a list of services provided at the facility and satisfy the following minimum services to comply with this subsection:

(1) Inpatient beds: Minimum of ten inpatient beds, with at least one room being an airborne infection isolation room.
(2) Treatment rooms: Minimum of ten treatment rooms in the emergency department to include:

- One pediatric exam/treatment
- One patients of size/large treatment
- One trauma/resuscitation

(3) Psychiatric room: Minimum of one room, whether in the emergency department or the inpatient unit, shall be provided for psychiatric care. This room is in addition to the number of rooms required in (1) and (2).

(4) Onsite imaging services to include:

- General Radiography
- Computed Tomography (CT)
- Magnetic Resonance Imaging (MRI)

[3] A facility must be able to demonstrate that it has the requisite equipment to adequately provide care for the health care services it delivers, including complying with all EMTALA requirements.

[4] A facility may provide library services electronically or online.

(i) A safe, structurally sound, habitable, sanitary, fire-resistant physical plant designed and equipped specifically for the delivery of contemporary forms of hospital care.
(ii) Facilities to provide adequate heat, light, ventilation, potable water, sewage disposal, electrical power, internal and external communications, and emergency utility services.
(iii) Sanitary garbage, trash, and waste disposal.
(iv) Internal and external environmental sanitation services.
(v) Sanitary laundry services for hospital garments and linens.
(vi) Sanitary hospital dietary services.
(vii) An internal fire and disaster plan, fire alarm system and evacuation plan.
(viii) Scheduled general and preventive maintenance services for building, services and biomedical equipment.
(ix) Participation with community agencies in the establishment of the role of the hospital in event of external disasters[5].
(x) Capability for obtaining police and fire protection, emergency transportation, grounds-keeping and snow removal.
(xi) Personnel recruitment, training and continuing education.
(xii) Business management capability.
(xiii) Short- and long-range planning capability.
(xiii) Fiscal services to assure continuity of operation under both normal and an emergency conditions.
(xiv) Comprehensive policies and standards for assuring the safety of patients, employees and visitors and for protection against malpractice and negligence.

The Department shall use this guidance when reviewing an application from a facility with an innovative hospital model. Please note the Department may need to complete additional surveys to determine an applicant's statutory and regulatory compliance.

[5] A facility must meet CMS guidelines and requirements to satisfy this subsection.

# EXHIBIT "E"

Byrnes Lease Co. LLC
7750 Bayview Avenue, Thornhill, ON, CA

January 13, 2023

***<u>Sent via UPS, Overnight Mail and via Electronic Mail</u>***

330 Lancaster Avenue, LLP
281 Montgomery Avenue
Bala Cynwyd, PA 19004
Joseph Wakim

With copy to:

Anthony J. Beldecos Esquire
Lundy Beldecos & Milby PC
450 N. Narberth Ave, Suite 200
Narberth, PA 19072

Re: Lease Agreement dated May 21, 2020, as amended by Lease Amendment Agreement (collectively, the "Lease") by and between 330 Lancaster Avenue, LLP ("Landlord") and Byrnes Lease Co. LLC ("Tenant") with respect to 330 Lancaster Avenue, Malvern, Pennsylvania (the "Demised Premises")

Dear Mr. Wakim:

Please consider this notice of our election to terminate the Lease pursuant to provisions contained in Article 1D of the Lease. As you are aware, the Lease is expressly contingent upon the Tenant and/or its Affiliate receiving the Approvals by December 31, 2022. In the event that Tenant is unable to obtain the Approvals by December 31, 2022, either Tenant or Landlord may terminate the Lease by written notice to the other. The Lease defines “Approvals” as:

> “unappealed and unappealable approval, subject to such conditions as are acceptable to Tenant, of (1) Tenant’s Primary Intended Use from East Whiteland Township under the zoning and land use ordinances and regulations of East Whiteland Township (“Township Approvals”), (2) building permit applications to permit construction of Landlord’s Work and Tenant’s Work by the East Whiteland Township codes enforcement officer, and of the Construction Documents by the state health department and any other governmental authority having jurisdiction over the licensing and operations of hospitals at the Demised Premises (“Construction Approvals”) and (3) Tenant’s application to all local, state and federal licensing authorities for license(s) to operate the Primary Permitted Use (the “Operating Licenses”). The Township Approvals, Construction Approvals and Operating Licenses are collectively called the “Approvals”.”

As the Landlord is aware, despite our mutual multi-year best efforts, we have faced significant difficulties obtaining all the Approvals, and as of December 31, 2022, we have received only the Township and Construction components of the Approvals. Despite our diligent and good faith pursuit of all Approvals, we were unsuccessful in obtaining the Operating Licenses by December 31, 2022, and it must be clear to us both that obtaining an Operating License is many months away.

On January 12, 2023, the LLC's Member Board of Directors convened for its first Board Meeting of calendar year 2023, and they discussed the outstanding status of the Approvals. Based on their review of the requirements for obtaining the third and final Approval, the Board made the determination to terminate the Lease pursuant to Article 1D, and have instructed me to provide this Notice to the Landlord.

Accordingly, the Lease will terminate effective immediately and neither party shall have any further obligations or liabilities in relation to the Lease except for those which, by the express terms of the Lease, survive termination.

The Board has asked me to convey their appreciation in the Landlord's efforts to assist with pursuit of the Approvals. Given the extensive time and effort of the parties to date to obtain the Approvals and prepare the Demised Premises for use and occupancy, we remain open to discussing potential terms for a new lease as a possible future path to allow both parties to recognize a return on their respective investments to date.

We look forward to hearing from you to discuss the way forward.

Yours truly,

John Hughes CPA, CA
CEO
Byrnes Lease Co. LLC

cc: Jeffery Cronin, Esquire (via email)
Jonathan Jordan, Esquire (via email)